[No. A092400. First Dist., Div. Five. Dec. 28, 2001.]

N. ARDEN DANEKAS, Plaintiff and Appellant, v.
SAN FRANCISCO RESIDENTIAL RENT STABILIZATION AND
ARBITRATION BOARD, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts IV and V of this opinion are not certified for publication.

## COUNSEL

Law Office of Steven S. Rosenthal, Steven S. Rosenthal and Jonathan Seigel for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Randy E. Riddle and K. Scott Dickey, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

SIMONS, J.—N. Arden Danekas appeals from an order denying his petition for writ of mandate, brought against the San Francisco Residential Rent

Stabilization and Arbitration Board (Rent Board) to overturn section 6.15A of the Rent Board's rules and regulations (hereafter section 6.15A). Section 6.15A implements Ordinance No. 237-99, passed by the San Francisco Board of Supervisors, governing the circumstances under which a landlord can evict a tenant who replaces a departing cotenant, in violation of a lease clause prohibiting sublet and assignment. On appeal, Danekas renews a host of legal challenges to section 6.15A that are without merit. Accordingly, we uphold this provision and affirm the trial court's ruling in favor of the Rent Board.

## BACKGROUND

In 1979, the San Francisco Board of Supervisors (Supervisors) adopted a comprehensive rental-housing ordinance known as the San Francisco Residential Rent Stabilization and Arbitration Ordinance. (S.F. Admin. Code, ch. 37, Residential Rent Stabilization and Arbitration Ordinance (Rent Ordinance).) The Supervisors adopted the Rent Ordinance because the lack of affordable rental housing in San Francisco was creating hardships on senior citizens, persons on fixed incomes, and low- and moderate-income households.

When adopting the Rent Ordinance, the Supervisors created a five-member Rent Board charged with safeguarding tenants from excessive rent increases, while also assuring landlords fair and adequate rents consistent with federal anti-inflation guidelines. The Rent Ordinance mandated that the Rent Board be comprised of two landlord commissioners, two tenant commissioners, and one member who would be neither a landlord nor a tenant. (Rent Ord., § 37.4, subds. (a) & (b).) The Supervisors conferred on the Rent Board a range of powers and duties, including the power to "Promulgate policies, rules and regulations to effectuate the purposes of this Chapter." (Rent Ord., § 37.6, subd. (a).) The purposes of the Rent Ordinance included, among others, the limitation of rent increases for tenants in occupancy (Rent Ord., § 37.3), the arbitration of rental increase adjustments (Rent Ord., §§ 37.8-37.8B), and the restriction of the grounds on which landlords could evict tenants from their rental units (Rent Ord., §§ 37.9-37.9B).

In 1998, the Rent Board enacted former section 6.15 of the Rent Board's rules and regulations (hereafter former section 6.15),[1] entitled "Subletting and Assignment," which regulated the circumstances under which a landlord could enforce a tenant's breach of a covenant against sublet or assignment.

---

[1] Former section 6.15 became effective on March 24, 1998, except subdivisions (a) and (f) which were effective May 25, 1998.

Among other restrictions, subdivision (a) invalidated lease provisions entered into on or after May 25, 1998, that forbade a sublet or assignment, unless conspicuous written notice was provided by the landlord. Subdivision (b) specified circumstances under which a landlord would be precluded from asserting breach of a lease or rental agreement by a tenant who had replaced an outgoing roommate with a new one without the landlord's consent. These circumstances included the following: if the agreement specified a number of tenants to reside in a unit; if the open and established behavior of the landlord and tenants established that the tenancy included more than one tenant; if the agreement permitted sublet or assignment, or did so subject to the landlord's consent, which was unreasonably withheld; or if an absolute prohibition against sublet or assignment had been waived. In addition, subdivision (c) set forth a seven-step process that a tenant was obligated to follow in order to establish that a landlord's rejection of a potential new roommate had been unreasonable.[2] Further, subdivision (d) stated that a landlord's unreasonable refusal to consent to a replacement tenant could "constitute a decrease in housing services" under the Rent Board's regulations, thereby entitling the tenant to a commensurate reduction in rent. (Former § 6.15, subds. (a)-(d); Rent Bd. Rules & Regs., § 10.10.)

On August 9, 1999, the Supervisors adopted Ordinance No. 237-99 (the Leno Amendment). The Leno Amendment revised section 37.2, subdivision (g) of the Rent Ordinance by amending the definition of "Housing Services" to include rights permitted to the tenant by agreement, express or implied, including the right to have a specific number of occupants in a unit, regardless of whether the agreement elsewhere prohibited subletting or assignment. The Leno Amendment also revised section 37.9, subdivision (a)(2) of the Rent Ordinance, to provide that, "notwithstanding any lease provision to the contrary, the landlord shall not endeavor to recover possession of the rental unit as a result of subletting of the rental unit by the tenant if the landlord has unreasonably withheld the right to sublet" so long as the original tenant continues to reside in the rental unit and the sublet constitutes a one-for-one replacement of a departing fellow tenant. The legislation

---

[2]The seven-step process required (i) the tenant to have requested the landlord in writing for permission to sublet or assign the unit to the new tenant before the new tenant's occupancy began; (ii) the proposed new tenant to have completed the landlord's standard application form or, upon request, to have provided sufficient information for a background and credit check; (iii) the tenant to have provided the landlord five business days to process the application; (iv) the proposed new tenant to have met the landlord's regular reasonable application standards; (v) the proposed new tenant to have agreed to sign and be bound by the current lease or rental agreement; (vi) the tenant to not have, without good cause, requested the landlord to consent to a new tenant more than one time per existing tenant during the previous 12 months; and (vii) the tenant to be replacing a departing tenant(s) with an equal number of new tenants.

enacting the Leno Amendment contained an expression of the Supervisors' intent "that the provisions . . . of [subdivision (c) of former section 6.15, providing the seven-step process for establishing when a landlord had unreasonably withheld consent[3]] also substantially apply to [the Leno Amendment], and that the Rent Board amend its Rules and Regulations as necessary to so provide."

On December 21, 1999, the Rent Board amended and renumbered former section 6.15, dividing it into three parts: section 6.15A of the Rent Board's rules and regulations (hereafter section 6.15A), applicable where the lease or rental agreement includes an absolute prohibition against subletting and assignment; section 6.15B, applicable where the agreement contains a clause requiring a landlord's consent to subletting and assignment; and section 6.15C, applicable where the landlord and tenant reside in the same rental unit. Appellant challenges only section 6.15A in this litigation.

Section 6.15A, subdivision (a) carries over its predecessor's requirement that landlords provide conspicuous written notice for any "absolute prohibition against subletting or assignment" in order for a sublet or assignment to constitute a ground for termination of a tenancy for leases or rental agreements entered into on or after May 25, 1998. Section 6.15A, subdivision (b) alters the circumstances when a landlord may not assert a breach of a lease or rental agreement by a tenant who replaces an outgoing tenant roommate with a new one, without the landlord's consent. Section 6.15A, subdivision (c) sets a 14-day limit for a landlord to respond in writing to a written request to sublease a rental unit. Section 6.15A, subdivision (d) reiterates the seven-step process for establishing when a landlord has unreasonably withheld consent to sublet. Finally, section 6.15A, subdivision (e) provides that the failure of a landlord to consent to a replacement tenant may constitute a "decrease in housing services," thereby entitling the tenant to pay reduced rent.

Within months of its enactment, appellant filed a petition for writ of mandate (Code Civ. Proc., § 1085) challenging section 6.15A. After a hearing on the matter, the trial court denied the petition.

DISCUSSION

I

(1) Because this dispute over the legality of section 6.15A presents pure issues of law, we review de novo the denial of a petition for writ of mandate.

---

[3]See footnote 2, *ante.*

(*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302].) When reviewing the legality of a regulation adopted pursuant to a delegation of legislative authority, we are limited to determining (1) whether the regulation is within the scope of the authority conferred; and (2) whether the regulation is reasonably necessary to effectuate the purpose of the statute. (*Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 65 [219 Cal.Rptr. 142, 707 P.2d 204]; *Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 29 [6 Cal.Rptr.2d 461].) "In enacting such rules and regulations, the [Rent Board] is empowered to ' "fill up the details" ' of the enabling legislation. [Citation.] The court's role is to decide whether in enacting the specific rule the [Rent Board] reasonably interpreted the legislative mandate. [Citation.]" (*Fox v. San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 656 [215 Cal.Rptr. 565].) "As a general proposition, administrative regulations are said to be 'shielded by a presumption of regularity' [citation] and presumed to be '*reasonable and lawful.*' [Citation.] The party challenging such regulations has the burden of proving otherwise. [Citation.]" (*Id.* at p. 655.)

## II

 Danekas contends that the Rent Board lacked the authority to issue section 6.15A for several reasons. First, he claims the Supervisors did not delegate authority to the Rent Board to issue regulations modifying the grounds for evictions in the Rent Ordinance. Appellant's contention is not supported by a fair reading of that ordinance, which grants the Rent Board broad powers to fashion the regulations needed to achieve the goals of the Rent Ordinance. The first power enumerated within the section of the ordinance describing the "POWERS AND DUTIES" of the Rent Board, states: "In addition to other powers and duties set forth in this Chapter, . . . the Board shall have the power to: [¶] (a) Promulgate policies, rules and regulations to effectuate the purposes of this Chapter . . . ." (Rent Ord., § 37.6.) This language, adopted by the Supervisors, is expansive in scope and unreserved, aside from the requirement that all regulations must "effectuate the purposes" of the law. The wording contains no indication that the Board lacked power to develop new regulations intended to effectuate the purposes of any modifications to the law enacted by the Supervisors through subsequent amendment.

Danekas then asserts that the Rent Ordinance limits the Rent Board to the regulation of *rent increases*. He relies upon language within the "Findings" portion of the Rent Ordinance, which recounts the broad goals of the

legislation: "This ordinance, therefore, creates a Residential Rent Stabilization and Arbitration Board in order to safeguard tenants from excessive rent increases and, at the same time, to assure landlords fair and adequate rents consistent with Federal Anti-Inflation Guidelines." (Rent Ord., § 37.1, subd. (b)(6).)

In fixing on this language alone, Danekas interprets the purposes of the Rent Ordinance too narrowly and without regard to certain other provisions of the ordinance that demonstrate an intent by the Supervisors to regulate the permissible grounds for tenant evictions. ■ Familiar rules of statutory interpretation guide our task. "The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.] To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. [Citation.] If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part. [Citation.] . . . Ultimately, the court must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and it must avoid an interpretation leading to absurd consequences. [Citation.]" (*In re Luke W.* (2001) 88 Cal.App.4th 650, 655 [105 Cal.Rptr.2d 905].)

■ In this instance, the Rent Ordinance contains entire sections devoted to regulating the bases on which landlords can evict tenants from their rental units, along with the procedures landlords must follow to do so. (Rent Ord., §§ 37.9, 37.9B.) Regulating the grounds for eviction is integral to the success of the statutory framework, because the Rent Ordinance permits unlimited rent increases whenever a rental unit becomes vacant. (Rent Ord., § 37.3.) As soon as an original tenant no longer permanently resides in a rental unit, the rent for that unit is temporarily decontrolled, allowing the landlord to boost the rent as high as the market permits. Once the unit is re-rented, it again becomes subject to the Rent Ordinance under a regulatory concept known as "vacancy decontrol/recontrol." Under this framework, governing the grounds for eviction is essential to the successful implementation of the Rent Ordinance, lest landlords circumvent the rent limitations by expelling tenants in order to raise rents. To prevent this activity, section 37.9 of the Rent Ordinance enumerates the acceptable grounds for tenant eviction. The inclusion of these provisions within the Rent Ordinance is an unmistakable expression of intent by the Supervisors that one purpose of their legislation was to implement comprehensive eviction controls, thereby

sustaining the overall legislative structure. Since the Supervisors explicitly provided the Rent Board with the power to promulgate rules and regulations to effectuate the purposes of the Rent Ordinance, the legislation gives the Rent Board authority to fashion regulations to govern effectively the grounds for eviction and the eviction process.

Quoting *Parmett v. Superior Court* (1989) 212 Cal.App.3d 1261, 1266 [262 Cal.Rptr. 387], Danekas also attempts to support his argument based on the tenet of statutory construction that "the enumeration of specific exceptions precludes implying others." ▆▆ This tenet is a version of the venerable maxim, *expressio unius est exclusio alterius*; i.e., to specify one thing in a statute is to impliedly exclude other things not specified. ▆▆ Citing this maxim, Danekas contends the fact that the Supervisors specifically authorized the Rent Board to issue regulations in only one of 14 grounds for eviction contained in the Rent Ordinance eliminates the possibility that the Supervisors empowered the Rent Board to issue regulations for the 13 remaining grounds for eviction included there. Rent Ordinance section 37.9, subdivision (a)(11) authorizes a landlord to regain possession of a rental unit on a temporary basis in order to make capital improvements or renovations to the unit. The subdivision sets a three-month limit on the time that a tenant can be required to vacate a unit while it is being worked on, but permits a landlord to apply for an extension beyond that period. It then states: "The Board shall adopt rules and regulations to implement the application procedure." (Rent Ord., § 37.9, subd. (a)(11).) Appellant correctly notes that equivalent language is not contained elsewhere in section 37.9, subdivision (a) of the Rent Ordinance.

Danekas's reliance upon this maxim is unavailing, because the quoted language from section 37.9, subdivision (a) of the Rent Ordinance is not part of an enumeration of any kind, nor is it part of a list of exceptions or exclusions within the portion of the text where it is situated. (See Webster's 10th New Collegiate Dict. (2000) p. 387 [defining "enumerate" in pertinent part as "to specify one after another: LIST"].) We further note, parenthetically, that the Supervisors did not adopt section 37.9, subdivision (a)(11) contemporaneously with the Leno Amendment and that subdivision (a)(11) deals with a subject matter markedly different from the Leno Amendment. These circumstances lessen the likelihood that the Supervisors would have considered the wording of subdivision (a)(11) at the time they were drafting the Leno Amendment. As a result, we are not persuaded that the Supervisors should be presumed to have worded the Leno Amendment differently from section 37.9, subdivision (a)(11) for the reason suggested by appellant.

▆▆ Moreover, as our Supreme Court has noted many times regarding this particular maxim of construction, "the maxim, while helpful in appropriate cases, 'is no magical incantation, nor does it refer to an immutable

rule. Like all such guidelines, it has many exceptions . . . . More in point here, however, is the principle that such rules shall always " 'be subordinated to the primary rule that the intent shall prevail over the letter.' " ' [Citations.] ' "This [maxim], of course, is inapplicable where its operation would contradict a discernible and contrary legislative intent." ' [Citation.]" (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 351 [45 Cal.Rptr.2d 279, 902 P.2d 297].) In light of the Supervisors' broad, express grant of power to the Rent Board to promulgate regulations to effectuate the purposes of the Rent Ordinance (Rent Ord., § 37.6), we conclude that if the Supervisors had truly intended to deny the Rent Board authority to adopt regulations for such a critical function of the Rent Ordinance as evictions, the Supervisors would have said so.[4]

## III

Danekas also contends that section 6.15A conflicts with the Leno Amendment and therefore represents an improper exercise of the Rent Board's rulemaking authority. Reduced to its essence, his argument is that the regulation applies even if the lease forbids a sublet or assignment, while the amendment applies only if the parties have expressly or impliedly agreed to an assignment or sublet. Resolution of this issue requires us to interpret the Leno Amendment; since we believe the amendment is consistent with the regulation, we reject the argument.

Section 37.2, subdivision (g) of the Rent Ordinance lists certain housing services owed by the landlord to the tenant. The landlord's failure to provide these services permits the tenant to petition the Rent Board for a rent reduction. The Leno Amendment added one item to the list: "[R]ights permitted the tenant by agreement, including the right to have a specific number of occupants, whether express or implied, and whether or not the agreement prohibits subletting and/or assignment."

Section 37.9 of the Rent Ordinance discusses the landlord's right to evict. The Leno Amendment added, "provided further that notwithstanding any lease provision to the contrary, a landlord shall not endeavor to recover possession of a rental unit as a result of subletting of the rental unit by the tenant if the landlord has unreasonably withheld the right to sublet, following a written request by the tenant, so long as the tenant continues to reside

---

[4]Danekas has requested that the court take judicial notice of the terms of 21 previous amendments to the Rent Ordinance, enacted from 1979 through 1998, pursuant to Evidence Code sections 452 and 453 (and, presumably, § 459). The request is denied because the previous amendments are not directly relevant to the dispositive points in this case. (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 962, fn. 1 [81 Cal.Rptr.2d 93, 968 P.2d 993].)

in the rental unit and the sublet constitutes a one-for-one replacement of the departing tenant[s]. If the landlord fails to respond to the tenant in writing within fourteen (14) days of receipt of the tenant's written request, the tenant's request shall be deemed approved by the landlord."

Appellant argues that the proper interpretation of these changes limits their application to those situations where the parties have agreed, expressly or impliedly, to a right to sublet. The trial court disagreed, finding that a "plain reading of the statute" reveals that categorical prohibitions against subleasing are prohibited if they interfere with replacing departing tenants on a one-for-one basis. We agree with the trial court.

Again, familiar rules of statutory interpretation govern our inquiry. Giving the language of the Leno Amendment its ordinary and generally accepted meaning, we believe that the list of housing services was expanded to protect a tenant's rights under a lease, including the right, express or implied, to maintain a specific number of cotenants, notwithstanding an express lease provision forbidding a sublet. Thus, a departing cotenant may be replaced regardless of an express contractual bar.

Consistent with this interpretation, we believe the modification of section 37.9, subdivision (a)(2) of the Rent Ordinance bars an eviction where a tenant sublets, even if the lease precludes a sublet, if certain conditions are met: (1) the tenant requested in writing approval of the sublet; (2) the landlord unreasonably withheld "the right to sublet"; (3) the tenant continues to reside in the unit; and (4) the sublet constitutes a one-for-one replacement of the departing tenant. The "right to sublet" referred to in the second condition is not one conferred by the landlord, as appellant contends. It is decreed in the ordinance, even in the face of a lease clause to the contrary.

We believe this to be the only reasonable meaning of the Leno Amendment. If, however, we were to find that appellant's interpretation of the language was also reasonable, which we do not, an examination of the legislative history suggested by him would provide little support for his analysis.

Danekas contends that this history demonstrates the Leno Amendment was not designed to affect lease clauses which flatly prohibit sublet and assignment. He directs our attention to the "Executive Summary" prepared by the Supervisors' office of the legislative analyst. This report characterizes then current law as permitting "the replacement of tenants if a landlord has

agreed," and goes on to state that "[p]ermitting tenants who wish to claim a decrease in housing services based on subletting would not exactly create new policy for the City . . . . [T]enants can already file petitions when they believe that landlords have unreasonably withheld consent to subletting. . . . [¶] It appears then that this proposed legislation would merely codify what is already in place." However, the report flatly contradicts this remark in its summary of the proposed action: "This ordinance *expands* the definition of 'Housing Services' to include the right to have a specific number of occupants in a rental unit, whether that right is express or implied, and *whether or not a rental agreement prohibits subletting or assignment.*" (Italics added.)

The evident conflict in the legislative analyst's description of the effect of the Leno Amendment undercuts its significance. Moreover, the report's description of the purpose of the amendment, the evil to be remedied, confirms an interpretation contrary to Danekas's. According to the report, a scarcity of affordable rental units in San Francisco had created a situation where some tenants were forced to rely on cotenancy arrangements to afford their rental. When one cotenant left, affordability could be maintained for the remaining occupants only if a replacement tenant could be brought in. In 1998, the Rent Board issued a regulation to facilitate subletting. In the year subsequent, there had been an unprecedented increase in the number of disputes at the Rent Board involving rental and lease agreements that contained absolute prohibitions against a sublet or assignment. These clauses prohibiting a sublet or assignment created the controversy addressed by the Leno Amendment.

Finally, we reject appellant's proposed interpretation because it would render most of the Leno Amendment meaningless. Such an interpretation is disfavored under the principle that amending a statute to make a material change manifests a legislative intent to change the meaning of the statute. (*Smith v. Board of Supervisors* (1989) 216 Cal.App.3d 862, 872 [265 Cal.Rptr. 466].) As noted above, former section 6.15, in existence when the Leno Amendment was enacted, addressed the circumstances under which a tenant could replace a departing cotenant without the landlord's consent when the rental agreement or the parties' conduct *permitted* a sublet with consent. Danekas's interpretation, then, cannot be correct. It would eliminate the only additional benefit to tenants conveyed by the amendment: even

when the lease or rental agreement *bars* a sublet, the tenant has the right to replace a departing cotenant under specified circumstances.[5]

## IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI

Finally, Danekas complains that section 6.15A is retroactive. He contends this both conflicts with the Leno Amendment, which he argues is not retroactive, and creates an unconstitutional impairment of contracts. We reject each contention.

First, there seems little question that the Leno Amendment, as well as the challenged regulation, applies to leases executed before it was enacted. Section 37.9 of the Rent Ordinance commences, "[T]his Section shall apply as of August 24, 1980, to all landlords and tenants of rental units . . . ." When the Supervisors modified Rent Ordinance section 37.9 to limit the right to evict, we presume it was aware of this preamble. (*People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288]; *Bailey v. Superior Court* (1977) 19 Cal.3d 970, 977-978, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].) If the Rent Board had intended the Leno Amendment to apply prospectively only, it would have said so.[6]

Thus section 6.15A and the Leno Amendment apply to preexisting rental agreements. In addition, each abridges certain contractual rights of landlords to evict and to preclude sublet or assignment. In determining whether an impairment of the contract clause exists, however, these conclusions form "the beginning, not the end of the analysis. A finding of impairment merely moves the inquiry to the next and more difficult question—whether that impairment exceeds constitutional bounds." (*City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 377 [185 Cal.Rptr. 645, 650 P.2d

---

[5]Danekas has requested that the court take judicial notice of an unadopted draft of the Leno Amendment, again pursuant to Evidence Code sections 452 and 453 (and, presumably, 459). Because the material is not directly material to the basis for our determination, the request is denied.

*See footnote, *ante*, page 638.

[6]Appellant argues that the regulation is inconsistent with the Leno Amendment because section 6.15A, subdivision (a) applies to "agreements entered into on or after May 25, 1998." Subdivision (a) requires conspicuous notice to tenants of lease provisions which flatly prohibit sublet or assignment and was enacted by the Rent Board in 1998. Since it predates the Leno Amendment and does not depend on it for authorization, any inconsistency is irrelevant.

1162].) Legislative impairment of contract rights is forbidden only if the impairment is substantial (*Allied Structural Steel Co. v. Spannaus* (1978) 438 U.S. 234, 244 [98 S.Ct. 2716, 2722, 57 L.Ed.2d 727]) and lacks a legitimate and significant public purpose (*Hall v. Butte Home Health, Inc.* (1997) 60 Cal.App.4th 308, 321-322, citing *Energy Reserves Group v. Kansas Power & Light* (1983) 459 U.S. 400, 411-412 [103 S.Ct. 697, 704-705, 74 L.Ed.2d 569] [70 Cal.Rptr.2d 246]). Neither is true here.

In *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247], our Supreme Court upheld a provision of Proposition 103, regulating insurers, which restricted the insurer's right to cancel or non-renew a policy. The court held that the impairment was not substantial: the regulation was "moderate and restrained," allowing insurers to continue to refuse to renew for nonpayment, misrepresentation, or a substantial increase in the hazard; it guaranteed insurers fair and reasonable rates; and it affected a "highly regulated industry, and one in which further regulation can reasonably be anticipated." (*Calfarm Ins. Co.*, at p. 830.)

For similar reasons, we conclude the Rent Board regulation challenged in this case does not substantially impair contract rights. It is "moderate and restrained," eliminating contractual prohibitions to sublet only in carefully tailored circumstances: when the landlord had agreed to a rental with multiple tenants, and one of the tenants departs, but only if the replacement tenant meets the lessor's reasonable standards. In addition, revolving tenancies are not permitted; at least one of the original tenants must be in residence. Further, the Leno Amendment and section 6.15A operate in a highly regulated industry. (*Interstate Marina Development Co. v. County of Los Angeles* (1984) 155 Cal.App.3d 435, 447 [202 Cal.Rptr. 377] [argument that a rent control ordinance was an unconstitutional impairment of contracts rejected, in part because the rental industry is routinely regulated; "Rent control, like the imposition of a new tax, is simply one of the usual hazards of the business enterprise."]; see also *Allied Structural Steel Co. v. Spannaus, supra*, 438 U.S. at p. 249 [98 S.Ct. at pp. 2724-2725].) Moreover, the ordinance and the regulation have no direct effect on the rent received by the landlord. Their only effect on rent is indirect; in some situations, cotenant replacement will enable the tenants to lengthen their tenancy, delaying a vacancy that would decontrol the rent. Finally, though the landlord's power to choose tenants is restricted, the Leno Amendment and section 6.15A

permit the withholding of consent for proposed substitute tenants if they do not meet reasonable application standards. (§ 6.15A, subd. (d).)[7]

In addition, the regulation promotes a legitimate and significant public purpose. As we discussed earlier, the Supervisors adopted the Rent Ordinance because the lack of affordable rental housing in San Francisco was creating hardships for senior citizens, persons on fixed incomes, and low- and moderate-income households. Some residential tenants in San Francisco shared rentals in order to afford the high costs. When one of those tenants left, a replacement was sought by the remaining tenants to maintain the same rent burden. Perceiving that landlords were reacting to that solution by forbidding sublets, the Supervisors responded with the Leno Amendment. That decision is entitled to appropriate deference. (*Energy Reserves Group v. Kansas Power & Light Co, supra,* 459 U.S. at pp. 412-413 [103 S.Ct. at pp. 704-705].) Thus, the Leno Amendment and section 6.15A represent a reasonable, balanced method of forestalling what the Supervisors viewed as the premature termination of tenancies, and bear a rational relationship to the legitimate goals of maintaining adequate and affordable rental housing. (Cf. *Hall v. Butte Home Health, Inc., supra,* 60 Cal.App.4th at p. 322.)[8]

## DISPOSITION

The order denying appellant's petition for writ of mandate is affirmed. Respondent shall recover its costs for this appeal.

Jones, P. J., and Stevens, J., concurred.

---

[7]It is noteworthy that the Rent Ordinance and the regulations enacted pursuant to it limit the master tenant's ability to secure the benefit of any increase in the fair rental value of the premises. The Rent Ordinance provides that if a tenant subleases the entire rental unit, the subtenant may not be charged a higher rent than the landlord charges. (Rent Ord., § 37.3, subd. (c).) Consistent with that, in August 2001, the Rent Board enacted section 6.15C, subdivision (3) of the rules and regulations, which provides that if only part of the unit is sublet, the master tenant "may charge the subtenant(s) no more than the subtenant(s)['] proportional share of the total current rent paid to the landlord." Formulae to calculate the allowable proportional share are then set out. (Rent Bd. Rules & Regs., § 6.15C, subd. (3)(a).)

[8]The heading of appellant's contract impairment argument states that section 6.15A also "violates substantive due process." No argument or case authority is ever cited for that proposition, so we deem it waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) In any event, the "critical issue with regard to due process is 'the same as that involved in connection with impairment of contract.'" (*Hall v. Butte Home Health, Inc., supra,* 60 Cal.App.4th at p. 323.) Because we have decided that issue against appellant, the due process argument fails as well.