[Nos. A122026, A123889. First Dist., Div. Two. Jan. 19, 2010.]

JORGE CHACON et al., Plaintiffs and Respondents, v.
EDWARD LITKE et al., Defendants and Appellants.

COUNSEL

Lewis Brisbois Bisgaard & Smith, Howard L. Churchill, Michael K. Johnson, Kimberly Pile and Sandra M. Ishaq for Defendants and Appellants.

Reed Smith, Paul D. Fogel, Raymond A. Cardozo, David J. deJesus; Law Office of Jonathan McCurdy, Jonathan McCurdy; Wartelle, Weaver & Schreiber and Paul F. Wartelle for Plaintiffs and Respondents.

OPINION

KLINE, P. J.—

## INTRODUCTION

In these consolidated appeals, defendants Edward Litke, and Edward Litke Revocable Trust of 1995 (Litke) appeal from a judgment and postjudgment order of the San Francisco Superior Court in a wrongful eviction action in favor of plaintiffs Jorge Chacon, Sr., Gilma Chacon and their adult children, Jorge Chacon, Jr. (Jorge Jr.), Amilcar Chacon, and Tania Chacon (Chacons).[1] Following a bench trial, the court awarded the Chacons damages and attorney fees under the San Francisco Residential Rent Stabilization and Arbitration Ordinance (Ordinance), ruling that Litke violated the Ordinance when, after bringing a successful unlawful detainer action against the Chacons so that he might effect repairs under the Ordinance, San Francisco Administrative Code section 37.9, subdivision (a)(11),[2] Litke wrongfully recovered permanent possession by refusing to allow the Chacons to return to the apartment after the expiration of 90 days.

Litke contends, among other things, that the court erred in rejecting his claims that (1) the Ordinance allows a right of reoccupation *only* to those tenants who temporarily vacate after notice from the landlord and not to tenants who leave only after the landlord brings a successful unlawful detainer action against them; (2) Litke recovered *permanent* possession of the premises by a valid judgment in the unlawful detainer action against the Chacons and that judgment was res judicata and collateral estoppel as to the Chacons' lawsuit; (3) a stipulation between the parties following the

---

[1] To avoid confusion, we will refer to the individual members of the Chacon family by their first names. Jorge Chacon, Sr., is referred to as "Jorge Sr." No disrespect is intended.

[2] All section references are to the Ordinance, chapter 37 of the San Francisco Administrative Code, unless otherwise indicated.

successful unlawful detainer action constituted a surrender of the lease by the Chacons, forfeiting any right to reoccupy the premises; (4) as a matter of law, Litke's alleged wrongful actions were absolutely privileged under the litigation privilege (Civ. Code, § 47, subd. (b)); and (5) the court erred in granting judgment on the pleadings as to three of Litke's affirmative defenses. Litke also challenges the attorney fee award as excessive. We shall affirm the judgment in its entirety.

## FACTS AND PROCEDURAL BACKGROUND

Jorge Sr. moved into the four-bedroom apartment at 264 Dolores Street in San Francisco in 1963 when he was 15 years old. He, his wife and their children resided there for their entire family life until January 11, 2005. Litke became their landlord when he purchased the property in the late 1980's.[3] Litke managed the Chacons' building through Dolores Operations, whose offices were on the first floor of the building. As the owner of Dolores Operations, Litke decided whether tenants should be evicted. Edward Litke was frequently seen around the building and knew the Chacons.

In March 2004, acting on a complaint from the Chacons, the San Francisco Department of Building Inspection inspected the premises and cited Litke for conditions that needed repair. These included mold, mildew, roof leaks, loose treads along the interior stairs and handrails, damaged rear stairs, a dry-rotted kitchen window frame, defective windows, and deteriorated carpeting causing drafts. The citation ordered Litke to complete repairs within 30 days. On May 12, 2004, after obtaining a permit to begin the repairs, Litke served the Chacons with a 60-day notice "to temporarily terminate the tenancy" under section 37.9, subdivision (a)(11). The notice quoted from section 37.9, subdivision (a)(11), stating in pertinent part: "The landlord seeks in good faith to remove temporarily the unit from housing use in order to be able to carry out capital improvements or rehabilitation work and has obtained all the necessary permits on or before the date upon which notice to vacate is given, and does so without ulterior reasons and with honest intent. Any tenant who vacates the unit under such circumstances shall have the right to reoccupy the unit at the prior rent adjusted in accordance with the provisions of this Chapter. The tenant will vacate the unit only for the minimum time required to do the work. . . . The tenant shall not be required to vacate pursuant to this Section 37.9[, subdivision] (a)(11), for a period in excess of three months; provided, however, that such time period may be extended by the Board or its Administrative Law Judges upon application by the landlord. . . . Any landlord who seeks to recover possession under this Section 37.9[, subdivision] (a)(11) shall pay relocation expenses as provided in Section 37.9C . . . ."

---

[3] Title to the building was held in the name of the Edward Litke Revocable Trust.

The Chacons did not move out within the 60-day period. They were unable to afford other housing and wished to remain in those portions of the apartment that would be unaffected by the repairs. Litke refused to allow this, as the repairs would be too extensive and would create health and safety concerns for any occupants.

*The Unlawful Detainer*

On July 29, 2004, Litke filed an unlawful detainer action in the San Francisco Superior Court (*Litke v. Chacon* (2004, No. CUD-04-611226)) in connection with the Chacons' refusal to vacate in accordance with the 60-day notice and the Ordinance. In the prayer of the unlawful detainer complaint, Litke sought a judgment for, among other things, "forfeiture of defendants' interest in the lease and leasehold." The Chacons moved to strike the request for forfeiture, and the superior court granted that motion on October 6, 2004. Thereafter, Litke moved for summary judgment on his unlawful detainer complaint. The court (Hon. Ronald Quidachay) granted summary judgment and on December 30, 2004, a judgment was entered in the unlawful detainer, awarding Litke "restitution of possession of the premises" and damages for unpaid rent, and costs and attorney fees. No appeal was taken from the judgment.

*The Stipulation*

The San Francisco County Sheriff was scheduled to evict the Chacons on January 5, 2005. On January 4, the Chacons filed an ex parte request to stay the eviction, contending they could not afford to move unless and until Litke paid their relocation expenses as required by the Ordinance. They requested a stay of either 10 days after payment of relocation expenses and/or one week. On the same day, the parties entered into a "Stipulation for Order for Stay of Eviction; Order" (the Stipulation). The Stipulation recited in relevant part:

"1. [Litke] has obtained judgment [against the Chacons] for restitution of possession of the premises . . . and for money in the amount of $2,922.27. A writ of execution has been issued and Sheriff eviction has been scheduled. The parties agree that the Sheriff eviction may proceed as set forth herein.

"2. There is a stay of eviction of defendants through January 11, 2005, midnight (hereinafter 'move out date'). The writ of execution may continue to be issued, and the Sheriff eviction may be scheduled, so long as there is no actual physical eviction of the defendants until after January 11, 2005, midnight. [The Chacons] agree to vacate and surrender complete possession of the subject premises to [Litke] on or before the move out date. [¶] . . . [¶]

"4. [Litke] shall pay to [the Chacons] the statutory relocation expenses in the amount of $6,000.00 as follows: [¶] a) [Litke] shall apply the rent owed for the period July 1, 2004, through January 11, 2005, in the sum of $4,396.00, as a deduction toward these relocation expenses, and [the Chacons] shall not pay rent to [Litke] for this period of time. [Litke] shall return [the Chacons'] rent check, tendered to [Litke], but not deposited, in the amount of $2,929.27. [Litke] shall further deduct the amount of $2,922.27 from any money judgment entered in this matter; and [¶] b) The balance of $1,604.00 shall be paid by [Litke] in a check issued to [Jorge Sr. and Gilma Chacon] when the Stipulation for Order is mutually executed between the parties."

The Stipulation was entered as an order of the court on January 4, 2005. The court granted a one-week stay of execution until January 11, 2005.

Jorge Sr. and his daughter Tania later testified that the Chacons entered into the Stipulation understanding that the eviction would be temporary and that they would return after Litke had completed repairs.

The Chacons moved out of the apartment on January 11, 2005. All found places to live, but the family was unable to stay together. Tania and her daughter ended up in Hayward, Jorge Jr. eventually moved to South San Francisco, and Jorge Sr., Gilma, and their son Amilcar moved to Fremont.

*Rent Board Denies Litke an Extension*

In mid-March 2005, Jorge Sr. wrote Litke, advising him that the Chacons were "ready to move back into our flat as soon as the work is finished within the 90 day period or sooner than that[,] which ever comes first." He asked Litke to contact him "to commence plans and logistics" for their return home.

On April 1, 2005, Litke petitioned the rent board for an additional 120 days within which to complete the repairs. The Chacons received notice and opposed the petition, claiming Litke was delaying the process to prevent them from reoccupying the apartment. Litke responded, claiming that the Chacons lacked standing to oppose the petition because the 60-day notice to vacate had advised them they would forfeit the lease unless they moved out, which they failed to do; the unlawful detainer judgment terminated their right to possession, causing a forfeiture of the lease and had res judicata and collateral estoppel effect as to the Chacons' right to reoccupy the unit; and the Chacons waived any right to reoccupy by virtue of the Stipulation staying their eviction for one week.

After hearing, the administrative law judge (ALJ) denied Litke's petition, finding among other things, that Litke had failed to provide the requisite documentation to support his extension petition and that his estimate of the time to complete the work was unreasonable in the circumstances. The ALJ rejected Litke's challenge to the Chacons' standing to object to the extension,[4] and ordered Litke to notify the Chacons in writing immediately upon completing the repairs and to permit them to reoccupy the apartment.

In late December 2005 or early January 2006, the rent board denied Litke's administrative appeal of this decision.

*The Wrongful Eviction Complaint*

On January 5, 2006, the Chacons filed the present wrongful eviction action against Litke.[5] They alleged, among other things, that Litke violated section 37.9 by refusing to allow them to reoccupy the apartment; that he negligently failed to exercise ordinary care in the ownership and management of the apartment by not complying with applicable housing, health and safety codes; and that he intentionally inflicted emotional distress on the Chacons, by depriving them of possession of the apartment. Litke demurred based on uncertainty and on the asserted collateral estoppel/res judicata effect of the unlawful detainer judgment and moved to strike various allegations of the complaint. The court overruled Litke's demurrer and denied the motion to strike and Litke filed his answer, denying the allegations and raising affirmative defenses.

After the Chacons dismissed all but the three causes of action listed above, they moved for judgment on the pleadings, seeking to bar three of Litke's affirmative defenses. These affirmative defenses were that Litke had complied with section 37.9 (Twelfth); that the Chacons' failure to perform the conditions, covenants, and promises required by their tenancy excused Litke from permitting them to reoccupy the apartment (Sixteenth); and that res judicata and collateral estoppel barred the Chacons' complaint (Seventeenth). At the hearing on the motion for judgment on the pleadings, counsel for Litke

---

[4] The ALJ ruled the unlawful detainer judgment did not have res judicata or collateral estoppel effect, because the petition for an extension of time did not involve the same cause of action or identical issues. He further ruled that section 37.9, subdivision (a)(11), grants the tenants the right to reoccupy the unit and is not subject to forfeiture, despite contrary language in the 60-day notice and no matter whether the tenants vacate voluntarily or involuntarily by court order. The unlawful detainer judgment, prepared by the landlord's attorney, did not grant forfeiture of the lease and the request for forfeiture had been stricken from the complaint. Finally, the ALJ concluded nothing in the Stipulation indicated that the Chacons intended to waive or relinquish their right to reoccupy.

[5] The Chacons named the Edward Litke Revocable Trust of 1995 as a defendant in February 2006.

clarified that the conduct underlying the Twelfth and Sixteenth affirmative defenses was Litke's compliance with the Ordinance by bringing the successful unlawful detainer action and the Chacons' refusal to vacate upon receiving the lawful 60-day notice. The Seventeenth affirmative defense of res judicata and collateral estoppel was based on the asserted preclusive effect of the unlawful detainer judgment. On August 17, 2007, the trial court (Hon. Peter Busch) granted the Chacons' motion for judgment on the pleadings as to the three challenged affirmative defenses, finding they failed to state facts sufficient to constitute a defense, and the court ordered judgment entered for the Chacons and against Litke on those affirmative defenses.

*Trial and Judgment for the Chacons*

On December 3, 2007, the matter came to a court trial before the Honorable Suzanne Ramos Bolanos. The testimony and report of housing inspector Claudio Bluer were admitted into evidence. Bluer testified he had inspected the building in February 2007, two years after it had been vacated by the Chacons. According to his report, the apartment exhibited, among other things, mold and mildew in the living room and bedrooms, water damage and rot, no finished floor covering holes in the floor, a "nonconforming and dilapidated" stairway, and "unsanitary conditions" throughout. The report stated that "[s]everal [code] violations constitute immediate life-threatening hazards, directly affecting health and safety (habitability)."

Evidence was presented that although Litke initially intended to allow the Chacons to reoccupy the apartment, he changed his mind after they "forced" him to file the unlawful detainer action. Litke admitted never telling the Chacons before they moved out that he planned to prohibit them from returning. Litke testified he did not believe he was required to finish the repairs, as he did not plan to rent the Chacons' apartment. He believed the Chacons never intended to reoccupy the apartment and had no right to do so because they had signed the Stipulation staying the eviction.

Jorge Sr. testified that when he left Delores Street, he was planning to be away for three months or less. "When the repairs were done, we would be back." Jorge Sr. also testified that when he signed the Stipulation, it was his understanding that he was going to leave the apartment for six months or less while repairs were going on. He did not intend to give up his right to return to the property by signing the document.

Tania, who was in law school at the time of the eviction, testified that she had seen the Stipulation when it was drafted and had discussed it with her father. When her parents signed the Stipulation, "it was our understanding

that it was solely based on capital improvements getting done; once that three-month period had expired, coming back. . . . It was never an issue of, wow, we're out of there for good. No, this was our home."

Real estate economist Richard Devine, Ph.D., testified as an expert witness for the Chacons that the difference between the Dolores Street apartment's fair market rent and the Chacons' controlled rent in 2005, summed over the possible length of a 20-year tenancy and discounted to present value was $381,825.

Gilma testified that she intended to live at the Dolores Street apartment for the rest of her life. Tania testified that upon leaving, her parents had made only short-term arrangements for housing because they thought they would return in 90 days. The Chacons testified as to the emotional and physical distress Litke's refusal to allow them to return had caused them.

In March 2008, after issuing a proposed statement of decision, to which Litke filed objections, the trial court issued its final statement of decision. It ruled that Litke had wrongfully recovered permanent possession of the apartment in violation of the Ordinance. The court concluded that, "[p]ursuant to the stipulation signed by the parties on January 4, 2005, [Litke] had the right to temporarily repossess [the Chacons'] apartment for a period not to exceed ninety days in order to make needed repairs. Upon expiration of those ninety days, however, [the Chacons] retained the statutory right under . . . section 37.9[, subdivision] (a)(11) to reoccupy the premises. Thus, the Court finds that [Litke] lawfully used the temporary possession provision under section 37.9[, subdivision] (a)(11) as well as the judgment in the unlawful detainer action to obtain possession of [the Chacons'] apartment. However, once he gained temporary possession of the premises, [Litke] wrongfully recovered *permanent* possession by refusing to allow [the Chacons] to return after the expiration of ninety days. This conduct violated section 37.9[, subdivision] (f)."[6]

The court rejected Litke's claims that the Chacons' lawsuit was barred by the litigation privilege of Civil Code section 47, subdivision (b), and *Action*

---

[6] Section 37.9, subdivision (f) provides: "Whenever a landlord wrongfully endeavors to recover possession or recovers possession of a rental unit in violation of Sections 37.9 and/or 37.10 as enacted herein, the tenant or Board may institute a civil proceeding for injunctive relief, money damages of not less than three times actual damages, (including damages for mental or emotional distress), and whatever other relief the court deems appropriate. In the case of an award of damages for mental or emotional distress, said award shall only be trebled if the trier of fact finds that the landlord acted in knowing violation of or in reckless disregard of Section 37.9 or 37.10A herein. The prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to order of the court. The remedy available under this Section 37.9[, subdivision] (f) shall be in addition to any other existing remedies which may be available to the tenant or the Board."

*Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232 [63 Cal.Rptr.3d 398, 163 P.3d 89] (*Action Apartment*), reasoning that the Chacons' claims were based on Litke's failure to allow them to return to the premises *after* conclusion of the unlawful detainer litigation. Consequently, Litke's claim of permanent possession "was not done in furtherance of the objects of the litigation," and accordingly, was not privileged.

The court awarded damages, finding that the unexpired term of the Chacons' tenancy on January 11, 2005, was 20 years. Using Devine's calculations, the court found the loss of use damages of Jorge Sr. and Gilma had a net present value of $381,825. Those damages were trebled pursuant to section 37.9, subdivision (f), for a joint award to Jorge Sr. and Gilma of $1,145,475 in economic damages. The court did not award loss of use damages to the Chacon children, who had paid no rent for their use and occupancy. The court awarded emotional distress damages of $25,000 each to Jorge Sr. and Gilma, $20,000 to Tania, $10,000 to Jorge Jr., and $10,000 to Amilcar. It did so, finding that Litke knew that Jorge Sr. and Gilma were in poor health and living on a fixed income of $1,500 per month, that Tania recently had given birth, and that Jorge Jr. and Amilcar depended on their parents for a place to live. Litke's conduct in taking permanent possession of the apartment was outrageous, "because he acted in complete disregard for the impact the eviction would have on the [Chacons'] lives and the likely mental distress the eviction would cause all of them to suffer." The court did not award punitive damages.

Judgment was entered on March 27, 2008, and an amended judgment was entered April 9, 2008, to correct the misnomer of the trust defendant. On April 11, Litke unsuccessfully moved for a new trial. Litke filed a timely appeal (No. A122026).

*Attorney Fee Award*

After the entry of judgment, the Chacons moved for an award of reasonable attorney fees, accompanied by supporting declarations. Litke opposed the motion, filing objections to the amounts sought by the Chacons. After hearing, the court awarded the Chacons $306,321.25 in attorney fees.

Litke timely appealed from the fee order, and the Chacons filed a cross-appeal (No. A123889).

In February 2009, we consolidated these appeals (Nos. A122026 & A123889). The Chacons requested dismissal of their cross-appeal from the fee order, and we dismissed that cross-appeal on May 29, 2009.

## DISCUSSION

## I.

The contention underlying most of Litke's assertions of error is that the Chacons had no right to reoccupy the premises after they were evicted. He contends that they forfeited that right under the Ordinance when they held over in violation of the 60-day notice, that he was awarded permanent possession by the judgment in the unlawful detainer action, and that, in any event, the Chacons gave up any right to reoccupy the premises when they executed the Stipulation, agreeing "to vacate and surrender complete possession of the subject premises to [Litke] on or before the move out date." He is wrong on all counts.

A. *The Ordinance*

Litke asserts the Ordinance allows a right of reoccupation *only* to those tenants who temporarily vacate after notice from the landlord and not to tenants who leave only after the landlord brings a successful unlawful detainer action against them.

■ "The construction of an ordinance is a pure question of law for the court, and the rules applying to construction of statutes apply equally to ordinances. [Citations.]" (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 12 [25 Cal.Rptr.3d 19].) In interpreting the ordinance, "we seek to ' "ascertain the Legislature's intent so as to effectuate the purpose of the law." ' [Citation.]" (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) "In seeking to ' "ascertain the Legislature's intent so as to effectuate the purpose of the law" ' [citation], we start with the statutory language. [Citation.] ' "If the language . . . is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." ' [Citation.]" (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 369 [64 Cal.Rptr.3d 434, 165 P.3d 154].) " 'To the extent a statutory text is susceptible of more than one reasonable interpretation, we will consider " 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " [Citation.]' [Citation.]" (*Id.* at p. 371.)

Litke relies upon a provision in the Ordinance that "[a]ny tenant who vacates the unit *under such circumstances* shall have the right to reoccupy the

unit . . . ." (§ 37.9, subd. (a)(11), italics added.) He maintains the Ordinance is unambiguous and that the phrase "such circumstances" must mean that the tenant vacates the premises in compliance with the notice. He reasons that a tenant who does not voluntarily vacate forfeits the right to reoccupy, giving the landlord the right to permanent possession.

■ Nothing in section 37.9, subdivision (a)(11), states that a tenant must *voluntarily* vacate to retain the right to reoccupy. The word "vacate" is not conditioned by the word "voluntary" or "consent" or any like term. Nor does the Ordinance state that landlords are entitled to permanent possession when a tenant does not voluntarily vacate. Rather, the Ordinance limits the landlord's recovery of possession of a rental unit to specific prescribed circumstances. Section 37.9, subdivision (a) provides: "A landlord shall not endeavor to recover possession of a rental unit unless . . . ." There follows a list of actions by the tenant or other circumstances in which the landlord is authorized to recover possession, including that at issue here, described in section 37.9, subdivision (a)(11). The *only* circumstance in subdivision (a)(11) allowing recovery of possession by the landlord authorizes the landlord to recover *temporary* possession for the limited period of three months in order to effect repairs. Neither that subdivision nor any other section of the Ordinance authorizes the landlord to recover permanent possession upon the tenant's refusal to voluntarily vacate after receipt of a 60-day notice.

■ Litke's reliance upon the phrase "[a]ny tenant who vacates the unit under such circumstances" (§ 39.7, subd. (a)(11)) is misplaced. That phrase refers to the circumstances identified in the preceding sentence: that is, "[t]he landlord seeks in good faith to remove temporarily the unit from housing use in order to be able to carry out capital improvements or rehabilitation work and has obtained all the necessary permits on or before the date upon which notice to vacate is given, and does so without ulterior reasons and with honest intent." (*Ibid.*) Nothing in the Ordinance indicates that the tenant who "vacates . . . under such circumstances" must do so voluntarily or forfeit the leasehold.

Moreover, the plain language of the Ordinance contemplates only a three-month period of possession by the landlord, which only the rent board or an ALJ may extend. The landlord retains possession only "for the minimum time required to do the work." (§ 37.9, subd. (a)(11).) The language of section 37.9, subdivision (e), providing that "[a]ny waiver by a tenant of rights under [the Ordinance] shall be void as contrary to public policy," rejects the idea of a waiver of rights by the tenant and, therefore, further supports our reading of the plain meaning of the Ordinance.

■ We conclude that the plain meaning of the Ordinance does not support Litke's claim that he was entitled to permanent possession under the Ordinance upon the Chacons' failure to voluntarily vacate after receipt of the 60-day notice.

Were we to conclude the Ordinance was ambiguous on this point, the purpose and structure of the Ordinance itself would persuade us that the Ordinance did not condition the right of return on whether the tenant complied with the 60-day notice voluntarily or pursuant to an unlawful detainer judgment. Section 37.9, subdivision (c), specifies the procedures landlords must follow in evicting tenants and prohibits them from doing so unless "one of the grounds enumerated in Section 37.9[, subdivision] (a) or (b) . . . is the landlord's dominant motive . . . ." (See *Danekas v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2001) 95 Cal.App.4th 638, 645 [115 Cal.Rptr.2d 694] (*Danekas*) [the Ordinance "regulat[es] the bases on which landlords can evict tenants from their rental units, along with the procedures landlords must follow to do so"].) The limitation on the circumstances in which the landlord can recover possession is consistent with the purpose of the Ordinance—to prevent skyrocketing rent increases from displacing seniors, persons on fixed incomes and low- to moderate-income households by establishing restrictions on and procedures for challenging rent increases. (*Danekas*, at p. 645.) "[G]overning the grounds for eviction is essential to the successful implementation of the Rent Ordinance, lest landlords circumvent the rent limitations by expelling tenants in order to raise rents. To prevent this activity, section 37.9 of the Rent Ordinance enumerates the acceptable grounds for tenant eviction. The inclusion of these provisions within the Rent Ordinance is an unmistakable expression of intent by the Supervisors that one purpose of their legislation was to implement comprehensive eviction controls, thereby sustaining the overall legislative structure." (*Id.* at pp. 645–646.) Litke's argument is inconsistent with the purpose and structure of the Ordinance, as it would result in permanent eviction of tenants who, believing that repairs were not required or that the landlord had an ulterior motive or dishonest intention in seeking eviction, resisted eviction under section 37.9, subdivision (a)(11). Litke's interpretation defeats the purpose of the Ordinance by denying tenants a way to challenge an unmeritorious eviction without risking permanent eviction.

We reject Litke's interpretation of the Ordinance as conditioning a tenant's right to reoccupy the unit upon compliance with the 60-day notice.

## B. *The Unlawful Detainer Judgment*

Litke contends the final judgment in the unlawful detainer action against the Chacons terminated their tenancy and awarded him permanent possession.

He maintains this judgment was entitled to res judicata or collateral estoppel effect[7] as to the Chacons' lawsuit challenging his refusal to allow them to reoccupy the premises. This challenge also encompasses Litke's contention that the trial court (Hon. Peter Busch) erred in granting the Chacons judgment on the pleadings as to three of his affirmative defenses, preventing him from asserting doctrines of res judicata and collateral estoppel and his compliance with the Ordinance as defenses to the Chacons' action. We find no error.

 Courts traditionally have applied the doctrine of collateral estoppel only if several threshold requirements are fulfilled. In *Lucido v. Superior Court* (1990) 51 Cal.3d 335 [272 Cal.Rptr. 767, 795 P.2d 1223], our California Supreme Court identified the first of these requisites as follows: "First, the issue sought to be precluded from relitigation must be *identical* to that decided in a former proceeding." (*Id.* at p. 341, italics added.) The claim that the unlawful detainer judgment precluded the Chacons' lawsuit founders upon this requisite.[8]

The amended judgment in the unlawful detainer action in favor of Litke declared him the "prevailing party" and "awarded restitution of possession of the premises" and daily damages (amounting to approximately $2,900 of back rent), plus costs of suit and attorney fees against the Chacons. The issue determined in that unlawful detainer litigation was whether Litke met the requirements of section 37.9, subdivision (a)(11), under which the unlawful detainer action had been brought, so as to be entitled to temporary possession to effect repairs pursuant to that statute. As we have concluded above, that subdivision did not entitle Litke to permanent possession, but only temporary possession to make repairs. Consequently, the unlawful detainer judgment did not determine his right to *permanent* possession, but only temporary possession under the Ordinance.[9]

---

[7] "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." (Rest.2d Judgments, § 27, p. 250.)

[8] "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be *identical* to that decided in a former proceeding. Second, this issue must have been *actually litigated* in the former proceeding. Third, it must have been *necessarily decided* in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in *privity* with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements. [Citation.]" (*Lucido v. Superior Court, supra*, 51 Cal.3d 335, 341, fn. omitted, italics added.)

[9] As observed by Judge Busch at the hearing on the Chacons' motion to strike certain of Litke's affirmative defenses, all that was determined in the unlawful detainer action "was that

As such, the judgment did not necessarily encompass the issue raised by the Chacons in their wrongful eviction action—their right to reoccupy the premises under the Ordinance upon expiration of the three-month period within which Litke was to have made repairs—and, therefore, whether Litke wrongfully maintained possession after this period by excluding them from the apartment. "The party asserting collateral estoppel bears the burden of establishing these requirements. [Citation.]" (*Lucido v. Superior Court, supra*, 51 Cal.3d at p. 341.)

Any ambiguity in the reach of the unlawful detainer judgment—and we believe there is none—would be resolved by the court's granting of the Chacons' motion to strike Litke's request for lease forfeiture from the prayer for relief of Litke's complaint. Furthermore, we have taken judicial notice of the acknowledgement made by Litke's attorney in Litke's summary judgment papers that any judgment would not award Litke permanent possession.[10] Therein, Litke argued that "[the Chacons] are not being permanently evicted from the subject premises and their lease is not being forfeited (pursuant to previous order of this Court). Instead, [their] tenancy is being **temporarily terminated** in order to allow substantial repairs to be made." In other places in his summary judgment motion, Litke reaffirmed that the unlawful detainer action was for a "temporary eviction," characterized his action as "for temporary termination of tenancy," and referred to the Chacons' "temporary" vacancy from the apartment.[11]

The unlawful detainer judgment did not award Litke permanent possession. Nor did it terminate the Chacons' tenancy or leasehold, but only terminated their possession temporarily. The court correctly held that the doctrines of res judicata and collateral estoppel did not bar the Chacons' wrongful eviction action.

---

at most the landlord had correctly followed the rules up to the point it was entitled to regain possession of the unit for the temporary purposes of doing repairs. It did not hold that the landlord thereafter complied with any obligations of the landlord to complete those repairs and allow the tenants to move back in. All that was at issue was whether the landlord would have that opportunity, and that's all the court could have or did decide it seems to me."

[10] The trial court failed to rule on the Chacons' request for judicial notice of this document. However, we as a reviewing court may take notice of matters properly subject to judicial notice, despite the failure of the trial court to do so. (See *Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1380 [259 Cal.Rptr. 918].)

[11] The Chacons seek a determination that Litke was "judicially estopped" by his argument on summary judgment from contending here that the unlawful detainer judgment entitled him to permanent possession. We need not determine that issue.

## C. *The Stipulation*

Litke maintains that the Stipulation between the parties following his successful unlawful detainer action constituted an unconditional surrender of the lease by the Chacons, forfeiting any right to reoccupy the premises. We disagree.

■ "Generally, a surrender of [leased] premises occurs only through the consent or agreement of the parties, evidenced either by an express agreement or by an unequivocal act inconsistent with the terms of the lease and with the relation of landlord and tenant." (42 Cal.Jur.3d (2008) Landlord and Tenant, § 301, p. 432, fns. omitted.) "Whether in any given case there has been a surrender of leased premises by a lessee and an unqualified acceptance of possession by the lessor are primarily *questions of fact* to be determined by the trial court from the whole transaction. [Citations.]" (*Rognier v. Harnett* (1941) 45 Cal.App.2d 570, 572 [114 P.2d 654], italics added (*Rognier*); accord, *Wiese v. Steinauer* (1962) 201 Cal.App.2d 651, 656 [20 Cal.Rptr. 295].)

■ The question here is whether, in entering the Stipulation, the parties intended a permanent surrender of the leased premises, rather than a temporary surrender of possession to enable Litke to make repairs. Stipulations are construed according "to the ordinary rules employed to interpret contracts. [Citations.] A court's paramount consideration in construing the stipulation is the parties' objective intent when they entered into it. (Civ. Code, § 1636; [citation].)" (*Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1341 [83 Cal.Rptr.2d 340], citing *Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 142 [199 P.2d 952], among others.)

As a contract, a stipulation " 'must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636; [citation].) The intention of the parties must be first determined from the language of the contract itself. (Civ. Code, § 1638; [citation].) However, where the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract. (Civ. Code, § 1647; [citation].) In resolving ambiguity, the court may consider not only the express, but the implied terms of the contract as well." (*Floystrup v. City of Berkeley Rent Stabilization Bd.* (1990) 219 Cal.App.3d 1309, 1317–1318 [268 Cal.Rptr. 898]; accord, *Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544–545 [54 Cal.Rptr.2d 128].)

The trial court determined that pursuant to the Stipulation, Litke had the right to temporarily repossess the apartment for a period not to exceed 90 days in order to make needed repairs, but upon expiration of that time, the Chacons retained the statutory right under section 37.9, subdivision (a)(11), to reoccupy the premises.

■ Litke's claim that the Chacons gave up any right to reoccupy the premises by the terms of the Stipulation rests upon the provision that the Chacons "agree to vacate and *surrender complete possession* of the subject premises to [Litke] on or before the move out date." (Italics added.) Litke argues that the term "surrender" in this context has a fixed legal meaning as follows: "When a tenant 'surrenders' *complete possession* it is clear that there is no possessory interest remaining in the estate." He cites no direct authority for this statement. Indeed, the primary authority he cites, *Rognier, supra,* 45 Cal.App.2d 570, recognizes that whether "there has been a *surrender of leased premises* by a lessee" is primarily a question of fact to be determined from the whole transaction. (*Id.* at p. 572, italics added.) In *Rognier,* the court found in favor of the tenant, who claimed he had vacated the premises with the plaintiff's express consent and permission after the plaintiff had agreed to cancel the lease. (*Id.* at pp. 572–573.) The case does not rely on any particular definition of the term "surrender," rather, it involves the question of whether statements and actions of the parties amounted to an oral surrender of the written lease. The court in *Rognier* does use the term "surrender" in stating that " '[a] lease contract may be brought to an end by the *surrender of the leased premises* and the acquiescence in such surrender by the lessor. . . .' " (*Id.* at p. 574, italics added.)

The language of the Stipulation before us does not indicate whether the surrender of possession was permanent or temporary. Nor does the Stipulation state that the Chacons agreed to surrender *permanent* possession and their right to reoccupy the premises. Use of the phrase "surrender [of] complete *possession,*" rather than "*termination* of the tenancy" or even "surrender of the *leasehold*" or "surrender of the *tenancy,*" indicates that the intent of the parties was to assure the Chacons and all their possessions vacated the entire premises for the period of repairs without a forced sheriff's eviction, rather than to secure a permanent termination of the Chacons' rights in the leasehold. Other provisions of the Stipulation, i.e., agreeing to a seven-day stay of the eviction and the reduction of the $6,000 relocation expenses Litke owed the Chacons by the amount of back rent the Chacons owed Litke, also evince that the purpose of the Stipulation was to avoid a forced eviction by the sheriff, to arrange for the monetary offsets, and to provide the Chacons with the cash to facilitate their vacating the premises. Litke, whose attorney drafted the Stipulation, presumably would have added

language regarding permanent possession and termination of the tenancy, had he so intended. The Stipulation does not manifest the objective intention of the parties to award permanent possession to Litke or to constitute a waiver of the Chacons' right to reoccupy the apartment under the Ordinance.

Were we to conclude the Stipulation was ambiguous, ample extrinsic evidence supports the trial court's interpretation. The Stipulation arose out of Litke's attempts to enforce the unlawful detainer judgment by evicting the Chacons. That judgment entitled him to only temporary possession and it strains credulity that the Chacons would give up their right to return to the premises in return for a seven-day stay of eviction. The Chacons' conduct also confirms that they understood the purpose of the Stipulation was to facilitate their temporary removal. They had proposed to stay in the portion of the apartment unaffected by repairs. That may also account for the Stipulation's reference to "complete" possession. Two months after they vacated the apartment, Jorge Sr. wrote Litke, advising that they were "ready to move back" as soon as repairs were finished within the 90-day period.

The Chacons' trial testimony also corroborated their intention at the time of executing the Stipulation was to return. Tania testified she had discussed the Stipulation with her father before he signed it and that they understood that it was "solely based on capital improvements getting done," and that they would return to the apartment "once that three-month period had expired." According to Tania, "[i]t was never an issue of, wow, we're out of there for good. No, this was our home." Jorge Sr., who signed the Stipulation, testified that when he signed it, he did not intend to give up his right to return to the property, did not intend to give up any right to have repairs made at the property, and did not intend to give up any of his rights under the rent ordinance. This extrinsic evidence provides substantial evidence supporting the trial court's finding that the Stipulation gave Litke temporary possession of the apartment for up to three months to make repairs and the Chacons retained their rights under the Ordinance to reoccupy the premises.

### D. *Litigation Privilege Inapplicable*

Litke contends that as a matter of law, his alleged wrongful actions were absolutely privileged under the litigation privilege. (Civ. Code, § 47, subd. (b).) The crux of Litke's argument is that his conduct in refusing to allow the Chacons to reoccupy the apartment was privileged because it "was undertaken for the purpose of enforcing the [unlawful detainer] Judgment and Stipulated Order . . . ." He relies *primarily* upon *Action Apartment, supra*, 41 Cal.4th 1232, and our opinion in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 [74 Cal.Rptr.3d 1]. Neither supports his conten-

tion. Rather, we view *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741 [90 Cal.Rptr.3d 181] (*Rental Housing*), as persuasive authority countering his claim.

■ "The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' [Citation.] 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [have] some connection or logical relation to the action.' [Citation.] *The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.'* [Citation.]" (*Action Apartment, supra*, 41 Cal.4th at p. 1241, second italics added; accord, *Feldman v. 1100 Park Lane Associates, supra*, 160 Cal.App.4th at p. 1485.)

" 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' [Citation.]" (*Action Apartment, supra*, 41 Cal.4th at p. 1241.) "To achieve this purpose of curtailing derivative lawsuits, the courts have interpreted the litigation privilege broadly. [Citation.]" (*Feldman v. 1100 Park Lane Associates, supra*, 160 Cal.App.4th at p. 1485, citing *Action Apartment*, at p. 1241.)

Whether Litke's conduct falls within the scope of the litigation privilege "is an issue of law, and not fact." (*Nguygen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 147 [81 Cal.Rptr.2d 392].)

It is undisputed that Litke's pursuit of the unlawful detainer action was subject to the privilege. In *Action Apartment, supra*, 41 Cal.4th 1232, the Supreme Court held that the litigation privilege preempted the provision of the Santa Monica tenant harassment ordinance that authorized civil and criminal penalties against a landlord bringing an action to recover possession of a rental unit without a reasonable factual or legal basis. (41 Cal.4th at pp. 1249–1250.)

In *Feldman v. 1100 Park Lane Associates, supra*, 160 Cal.App.4th 1467, we held pursuant to *Action Apartment*, that the "filing of [an] unlawful detainer action clearly fell within the litigation privilege." (*Id.* at p. 1486.) So, too, the service of the notice to quit and certain prelitigation communications by the landlord's agent fell within the privilege in the circumstances of that

case, where service of the notice to quit was " 'a communication . . . "in furtherance of the objects of the litigation" ' " (*id.* at pp. 1486–1488) and the agent's communications to the tenants "were clearly connected to and made in anticipation of the eviction action they threatened" (*id.* at pp. 1489–1491).

■ As recognized above, the litigation privilege may extend to steps taken *after* the trial or other proceeding. (*Action Apartment, supra,* 41 Cal.4th at p. 1241, citing *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*).) In *Rusheen,* the Supreme Court held that actions taken to collect a judgment were protected by the litigation privilege of Civil Code section 47, subdivision (b), as "communication[s]" in the course of judicial proceedings, "unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action . . . ." (*Rusheen,* at p. 1065.) According to *Rusheen,* "where the cause of action is based on a communicative act, the litigation privilege extends to those noncommunicative actions which are necessarily related to that communicative act." (*Id.* at p. 1052.) In *Rusheen,* "because the claim for abuse of process was based on the communicative act of filing allegedly false declarations of service to obtain a default judgment, the postjudgment enforcement efforts, including the application for writ of execution and act of levying on property, were protected by the privilege." (*Ibid.*)

Litke contends that his right to permanent possession of the property is grounded upon the final judgment in the unlawful detainer and the order of surrender entered by the court pursuant to the Stipulation. He attempts to characterize his refusal to allow the Chacons to reoccupy the premises as postjudgment conduct enforcing the judgment and the order entered upon the Stipulation. The trial court disagreed, as do we. Recognizing that the unlawful detainer action and the 60-day notice to temporarily terminate tenancy were privileged communications, the trial court reasoned that the Chacons' action against Litke was not based on either. "Rather, [the Chacons'] claims are based on [Litke's] failure to allow them to return to the premises *after* the litigation had concluded and he had obtained temporary possession. That conduct, namely [Litke's] claim of permanent possession of the apartment, was not done in furtherance of the objects of the litigation. As a result, it is not protected under the litigation privilege as set forth in *Action Apartment*[, *supra,* 41 Cal.4th 1232]."

In *Rental Housing, supra,* 171 Cal.App.4th 741, Oakland landlords sought a writ of mandate seeking to prohibit enforcement of an initiative measure amending the rent control ordinance of the City of Oakland. Division Three of this appellate district concluded that certain provisions of the measure were preempted by state law and others were not. (*Id.* at p. 749.) Petitioners claimed,

among other things, that the litigation privilege facially preempted provisions of the measure authorizing civil suits for injunctive relief and money damages by tenants against a landlord or anyone assisting the landlord in wrongfully recovering possession of a rental unit in violation of enumerated grounds for eviction. In an analysis relevant to the question here, Division Three rejected this claim, relying upon *Action Apartment, supra,* 41 Cal.4th 1232.

■ According to the *Rental Housing* court: "Section 7.A(2) of Measure EE creates a cause of action in favor of a tenant based on a landlord's wrongful attempts to recover possession or recovery of possession in violation of the just cause requirements of the [Oakland rent control ordinance]. Section 7.B permits a tenant to recover damages for a landlord's violation of Measure EE. On their face, these provisions create liability for a range of conduct that does not *necessarily* include filing a lawsuit to recover possession (such as service of an eviction notice with no intent to proceed to litigation, or constructive eviction by failure to provide heat), or that arise from a landlord's conduct after recovery of possession (*such as refusal to allow a tenant to return after an eviction to permit repairs,* or re-rental of a unit following an owner move-in eviction). *Such acts do not relate to litigation and are not within the conduct protected by the litigation privilege.*" (*Rental Housing, supra,* 171 Cal.App.4th at p. 767, second and third italics added, fn. omitted.)[12] We agree and further conclude that Litke's conduct in refusing to allow the Chacons to reoccupy the premises after their temporary eviction, was not an effort by him to "enforce" the unlawful detainer judgment or the Stipulation, neither of which awarded him permanent possession. Rather, it was the type of "independent, noncommunicative, wrongful act" that is clearly unprotected by the privilege. (*Rusheen, supra,* 37 Cal.4th at p. 1065.)

The litigation privilege did not apply to Litke's conduct in refusing to allow the Chacons to reoccupy the apartment.

### E. *Striking of Litke's Affirmative Defenses*

Litke contends the court erred in granting judgment on the pleadings as to three of his affirmative defenses. As we have observed, at the hearing on the motion for judgment on the pleadings, Litke's counsel clarified that the conduct underlying the Twelfth and Sixteenth affirmative defenses was

---

[12] Litke's sole reference to *Rental Housing, supra,* 171 Cal.App.4th 741, appears in his reply brief, wherein he attempts to distinguish it on the basis that "the case does not deal with an agreement between the parties to surrender the tenant's interest." He fails to explain how that difference matters here.

Litke's compliance with the Ordinance by bringing the successful unlawful detainer action and the Chacons' refusal to vacate upon receiving the lawful 60-day notice. The Seventeenth affirmative defense of res judicata and collateral estoppel was based on the asserted preclusive effect of the unlawful detainer judgment.

Litke's claim that he complied with the Ordinance in legally evicting the Chacons under section 37.9, subdivision (a)(11), is irrelevant to the issue whether he continued to be lawfully in possession after the three-month period had expired. Our determination as a matter of law that the Ordinance did not authorize him to retain permanent possession necessarily defeats his claim that the court erred in striking his Twelfth affirmative defense asserting his compliance with the Ordinance. It also necessarily defeats his Sixteenth affirmative defense that the Chacons' failure to vacate upon receiving the 60-day notice excused him from permitting them to reoccupy the apartment.

Our determination that the unlawful detainer judgment did not bar the Chacons from pursuing the underlying action as a matter of res judicata or collateral estoppel defeats his Seventeenth affirmative defense.

We conclude that Judge Busch did not err in granting judgment on the pleadings on these affirmative defenses.

F. *Attorney Fee Award*

The trial court awarded the Chacons $306,321.25 in attorney fees under the fee-shifting provision of the Ordinance. Litke challenges the attorney fee award as excessive, contending the court erroneously applied a lodestar approach to the attorney fee provision of the Ordinance. He further contends the court erred in awarding the Chacons' primary attorney, Jonathan McCurdy, $350 per hour as a reasonable market rate, when McCurdy's fee agreement with the Chacons provided that his reasonable hourly rate was $300.[13] We review the trial court's setting of the lodestar figure for abuse of discretion. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

As the trial court recognized in determining the fee award, "[n]o appellate or precedential authority exists mandating the use of the lodestar method to

---

[13] In fact, the case was taken on a contingency basis. As McCurdy states in his declaration: "I represented plaintiffs pursuant to a contingency agreement. According to that agreement, the plaintiffs[] had no obligation to pay fees unless they settled or won at trial. Pursuant to that agreement I am to receive 30% of the Judgment in this matter, or the court awarded fees, whichever is greater. The statutory fee award, therefore, will go to increasing the amount retained by the plaintiffs. When I agreed to take this case on a contingent basis, I had the expectation that if we were successful, my fee would reflect the greater fee paid for contingent work in the legal marketplace."

calculate fee awards under the Rent Ordinance." Thus, the court was left with the language of the Ordinance: "The prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to order of the court." (§ 37.9, subd. (f).) The court determined the lodestar method was appropriate for calculating fees and it was correct in doing so.

▮▮▮ Under the lodestar method, attorney fees are calculated by first multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate of compensation. (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1136; *Serrano v. Priest* (1977) 20 Cal.3d 25, 48, fn. 23 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*); Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. Sept. 2008 update) §§ 11.1, 11.2, 11.3, pp. 288–295 (Pearl, California Attorney Fee Awards).)

As the Supreme Court explained in *Ketchum v. Moses, supra,* 24 Cal.4th 1122: "Under *Serrano III,* the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. (*Serrano III, supra,* 20 Cal.3d at p. 49.) *The purpose of such adjustment is to fix a fee at the fair market value for the particular action.* In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services. The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' (*Ibid.*)" (*Ketchum v. Moses,* at p. 1132, italics added.) "The lodestar adjustment method . . . has also been widely applied by the Courts of Appeal under a broad range of statutes authorizing attorney fees. [Citations.] [¶] Indeed, . . . '[T]he Legislature appears to have endorsed the [lodestar adjustment] method of calculating fees, except in certain limited situations.' (*Flannery v. California Highway Patrol* [(1998)] 61 Cal.App.4th 629, 646 [71 Cal.Rptr.2d 632].) When the Legislature has determined that the lodestar adjustment approach is not appropriate, it has expressly so stated." (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1134–1135.)

▮▮▮ As observed in one leading treatise on attorney fees, *Ketchum v. Moses, supra,* 24 Cal.4th 1122, "reaffirmed the primacy of the lodestar method for *all* fee-shifting statutes, holding that it was properly applied under the anti-SLAPP statute. ([Code Civ. Proc.,] § 425.16.)" (Pearl, Cal. Attorney

Fee Awards, *supra*, § 11.2, p. 289, italics added.) The Supreme Court reasoned: "because the anti-SLAPP [attorney fee] provisions refer to attorney fees and costs without indicating any restrictions on how they are to be calculated, we accordingly presume that the Legislature intended courts use the prevailing lodestar adjustment method. [Citation.]" (*Ketchum v. Moses*, at p. 1136.)

Under the similar language of the Ordinance here, we will presume the board of supervisors, in adopting the fee-shifting provision, intended courts to use the lodestar adjustment method.

Litke's real complaint is that the trial court "enhanced" the lodestar by awarding McCurdy $350 per hour as a reasonable market rate, when McCurdy's fee agreement with the Chacons provided for a reasonable hourly rate of $300 per hour. In fact, the trial court rejected the Chacons' requests for a 1.5 multiplier enhancement of the fee award based on contingent risk, the "excellent" results achieved in the case, and the public service the Chacons performed in enforcing the Ordinance. The court did not believe any of these factors warranted an enhancement in the circumstances, and the Chacons' appeal of the award has been dismissed at their request.

The trial court also rejected the Chacons' argument that McCurdy's reasonable hourly rate was $400 and instead, "[a]fter reviewing all arguments and evidence submitted by the parties, including numerous expert declarations and the hourly rate set forth in [the Chacons'] fee agreement," found that McCurdy's reasonable hourly rate was $350. Litke does not dispute that $350 an hour is a reasonable market rate for the services provided by an attorney of McCurdy's experience. Rather, he argues that the fee was excessive for the sole reason that it exceeded the amount the Chacons and McCurdy agreed to be a reasonable hourly rate in their fee agreement. He is wrong.

 "The reasonable market value of the attorney's services is the measure of a reasonable hourly rate. [Citations.] This standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel. [Citations.]" (Pearl, Cal. Attorney Fee Awards, *supra*, § 12.26, pp. 358–359.) Clearly, the court here did not abuse its discretion in awarding $350 per hour as a reasonable hourly rate for McCurdy.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs in connection with this appeal.

Lambden, J., and Richman, J., concurred.

A petition for a rehearing was denied February 8, 2010, and appellants' petition for review by the Supreme Court was denied April 28, 2010, S181195.