Filed 5/31/22

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| BRENDON WELCH et al., | B311507 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. ND075582 & 18STPB10412) |
| v. | |
| FREEMAN H. WELCH, Individually and as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Ana Maria Luna, Judge.  Reversed and remanded.

FEM Law Group and F. Edie Mermelstein for Plaintiffs and Appellants.

California Appellate Law Group, Charles M. Kagay and Claudia Ribet; Velasco Law Group, Peter Ali Sahin and Sindee M. Smolowitz for Defendant and Respondent.

_____

Appellants Brendon Welch (Brendon) and Jeanne Donohoe (Jeanne) appeal the probate court's January 14, 2021 orders:  (1)

1

denying Brendon's Petition for Recovery of Property under Probate Code section 850[1] and sustaining objections thereto by respondent Freeman H. Welch (Freeman); and (2) denying Brendon's Petition for Letters of Administration and granting Freeman's Petition for Probate of Will.

At issue is whether a mediation settlement agreement that Freeman and his now-deceased wife Patricia Ann Welch (Patricia) entered into after separation and in anticipation of dissolution of their marriage is a "complete property settlement" within the meaning of section 145, which operates as a statutory waiver of certain of Freeman's rights as a surviving spouse enumerated in section 141, including the right to inherit from Patricia and to be appointed as the personal representative of her estate.[2]  We reverse the probate court's orders and remand the matter for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### *The Family Court Action*

In September 2015, after 36 years of marriage, Freeman and Patricia separated.  Freeman filed a petition for dissolution

---

[1] All further statutory references are to the Probate Code unless otherwise indicated.

[2] Brendon is one of Patricia and Freeman's two adult sons. Jeanne is Patricia's sister and the successor trustee and alternate executor named in Patricia's estate planning documents.

[3] We take judicial notice of the appellate record in Case No. B295880, and our prior unpublished opinion in *Welch v. Welch*

of marriage, and requested that the court make a determination of rights to the couple's community and quasi-community property, which he listed in an attachment to the petition. Patricia filed a response, also requesting dissolution of the marriage and division of their property, as well as an award of spousal support payable to her from Freeman. In November 2016, Freeman and Patricia each verified that they had served a Preliminary Declaration of Disclosure.

In October 2017, the parties participated in mediation and executed a five-page, predominantly handwritten settlement agreement (MSA), dividing the couple's property and addressing other financial issues, including spousal support. The MSA was dated October 6, 2017, and it was signed by both parties and their respective attorneys. It included the following provisions for division of their property:

<u>Property Division</u>

Petitioner shall receive the following items subject to equalization:

1. Book of Wells Fargo business at a value of $995,700 subject to equalization

2. 1/2 of current IRA at Wells Fargo Advisors XXX5235 with a current value of $62,657 (all account amounts subject to confirmation)

3. 1/2 of DoS value of Farmers acct XX8131 valued at $26,859

---

(Jun. 3, 2020, B295880), from which portions of the facts and procedural history are taken.

4. 1/2 of Pet's Deferred Comp Plan with current value of $7,858

5. Pet's S.P. and C.P. portion of his 401K Plan per QDRO[4] to be prepared by Nancy Bunn, Atty, using DOS of 9/29/2015

6. Marriott timeshare XX5190 at value of $2,750

7. Mercedes SLK 320 at value of $3,324

8. Household items attached hereto at 0 value.

Respondent shall receive the following items:

1. 6333 E. Colorado Street, Long Beach, CA with est FMV net $854,530.

2. 1/2 of items # 2-4 inclusive set forth above in Petitioner's items

3. Respondent's C.P. share of Pet's 401K to be divided by QDRO by Nancy Bunn, Atty, using DOS of 9/29/2015.

4. Marriott timeshare XX8041 at 0 value (Resp's SP)

5. Mercedes GL450 at value of $10,686.

6. Equalization payment in an amount to be determined after running Propertizer[5]

7. All furniture, furnishings and personal property in her possession except for items on Pet's list

Parties shall sell Kona Coast timeshare and equally divide net proceeds.

---

[4] QDRO is an acronym for "qualified domestic relations order."

[5] "Propertizer" is commercial software that divides community assets and debts.

Respondent reserves the right to review and verify the documents and amounts to each party as the result of the November 2015 splitting of accounts (Wells Fargo) #8858, 5961, 5185 now held by petitioner and respondent in Wells Fargo Accounts #4655 and 2472.

Nancy Bunn, as QDRO attorney, shall be instructed to tax impact division of QDRO regarding the equalization payment to be paid by Petitioner to Respondent from his SP and CP portion of the account.

Parties will prepare a Propertizer using the above referenced dates to determine the precise Amount of the equalization payment. (Sept 29, 2015 DOS)

Parties will prepare a formal Jdgmnt for submission to David Weinberg, Commissioner (ret.) who shall serve as the judicial officer regarding all issues arising from this settlemt; entry of Jdmt and post-Judgment matters.

All other credits and reimbursements waived.

## HOUSEHOLD AND GARAGE ITEMS

Entire garage <u>office</u> contents

Tools-Parts-Cables-Hardware, etc.

Workbench with all contents including shelves of Coke crates

All neon signs, art, license plates, banners and miscellaneous decorations, etc. in garage

Monitor audio speakers

SAE speaker switch

Yamaha turntable (in box above office)

Photographs and videotapes (I was cameraman on all.
Happy to share cost of making copies of whatever Patsy
wants.)
Sand bottles and rack
Trunk with electric trains
Jax beer opener
Safe contents that belong to or are related to Petitioner
One-half silver coins (located in kitchen cabinet)

The MSA stated: "We have read the entire stipulation and agreement. We understand it fully and request the court to make our stipulation and agreement the Court's order. . . . We waive all further notice of this order."

In November 2017, Freeman drafted a proposed formal judgment and sent it to Patricia. The judgment provided for the dissolution case to proceed as an uncontested matter. In January 2018, Patricia informed Freeman that she did not agree with the draft judgment and itemized numerous objections to its provisions in a letter from counsel.

On January 19, 2018, Freeman filed a request for order to enforce the settlement and enter judgment pursuant to Code of Civil Procedure section 664.6. The motion attached both the MSA and Freeman's proposed judgment.

On March 6, 2018, Patricia filed an opposition to the motion to enforce the MSA and to enter judgment, arguing that, pursuant to the MSA, any dispute between the parties regarding the terms of their settlement or entry of judgment must be brought before the mediator, not the trial court; the court had no authority to enter Freeman's proposed judgment because the MSA required preparation of an agreed-upon formal judgment;

6

Freeman's proposed judgment contained additional material terms that were not included in the mediation agreement, and were contrary to it; and the procedure for Patricia to object to the draft judgment's provisions necessarily depended on whether the trial court or the mediator would resolve those disputes. Patricia requested that the court deny Freeman's request to enforce the settlement terms in the MSA and deny entry of judgment thereon. Patricia also requested that the court enforce the provision in the MSA for resolution of disputes, by ordering the parties back to the mediator to resolve any disputes about the settlement terms.

On March 14, 2018, Freeman filed a reply, arguing there was no need for additional mediation because the proposed judgment faithfully reflected the mediation agreement.

On March 19, 2018, the parties appeared for the hearing on Freeman's motion. The hearing on the motion to enforce settlement and enter judgment was continued to June 25, 2018. The court set a trial setting conference for the same day.

On May 21, 2018, Freeman filed a declaration of his counsel in support of the pending motion for entry of judgment. In the declaration, Freeman's counsel noted: "This is a dispute about (1) who has the authority to resolve this Motion for Entry of Judgment and (2) a dispute about the contents of the Judgment. [Freeman] contends this Court has the authority to resolve the dispute and enter the Judgment filed concurrently herewith and that this Judgment is consistent with the terms of the parties' written agreement dated October 6, 201[7]. [Patricia] disagrees and/or has refused to respond."

With the declaration of counsel, Freeman lodged a second proposed judgment. Counsel stated in the declaration that

7

Freeman had "agreed to adopt nearly all of [Patricia's] changes to Judgment #1" and the second proposed judgment was "the mirror-image of the parties' agreement [reached in mediation]." Freeman's counsel further stated that counsel had personally delivered a copy of the second proposed judgment to Patricia's attorney, along with Freeman's final declaration of disclosure, and a waiver of Patricia's final declaration of disclosure. Freeman asked the court to enter the second proposed judgment at the hearing pursuant to Code of Civil Procedure 664.6 and Los Angeles County Local Rule 5.16.

Patricia did not respond to Freeman's counsel's declaration. On June 16, 2018, Patricia died. Neither the hearing on the motion nor the trial setting conference occurred on June 25, 2018.

On July 6, 2018, the trial court signed and filed the second proposed judgment dissolving the parties' marriage and distributing their property.

On August 6, 2018, counsel for both parties appeared in court. Patricia's counsel informed the court that her client had died. Freeman's counsel stated his client's position that the case was dismissed by operation of law. Neither party's counsel nor the court raised the existence of the judgment signed by the court the prior month. The court dismissed the case without objection from either party.

On October 22, 2018, Freeman moved to set aside the judgment signed in July under Code of Civil Procedure section 473 and Family Code section 2105. Brendon, acting as the proposed administrator of Patricia's estate and represented by his own counsel, opposed the motion.

On December 17, 2018, the court filed a notice of ruling and order on the motion to vacate judgment, which included its

8

findings that Freeman's Motion to Enter Judgment under Code of Civil Procedure 664.6 was never submitted for decision, Patricia died on June 16, 2018, the Court erroneously signed Freeman's proposed Judgment submitted in conjunction with the Motion to Enter Judgment on July 6, 2018 unaware of Patricia's death. The court ruled that the Judgment entered on July 6, 2018, was void, vacated, and set aside.

Brendon appealed. On June 3, 2020, this Court issued an opinion affirming the family court's order setting aside the dissolution judgment. We concluded that the matter had not been submitted to the family court prior to Patricia's death and, as a result, the family court lacked jurisdiction to enter the judgment.

### The Probate Court Action

On November 8, 2018, Brendon filed a Petition for Letters of Administration. He was appointed Special Administrator of Patricia's estate on February 11, 2019.

On April 2, 2019, Brendon filed a Section 850 Petition for (1) Recovery of Property Wrongfully Held By Trust And Assessment of Double Damages; (2) Declaration of Heirship; (3) Constructive Trust; (4) Accounting; and (5) Quiet Title. On January 13, 2021, Brendon filed a Verified Supplement to Section 850 Petition seeking a declaration of heirship under sections 141 and 145, nominating Jeanne to be the executor over Patricia's estate and successor trustee over Patricia's assets held in trust pursuant to section 141.

On May 23, 2019, Freeman opposed Brendon's Petition for Letters of Administration and filed a Petition for Probate of

9

Patricia's pour over will.

On June 17, 2019, Freeman objected to Brendon's Section 850 Petition.

On June 24, 2019, the court continued the probate action pending this court's decision in the family law appeal. As stated above, we issued our opinion on June 3, 2020.

On January 14, 2021, the above petitions came on for hearing before the probate court.

The court granted Freeman's Petition for Probate of Will filed on May 23, 2019 and admitted a pour-over will dated May 22, 1996. The court over-ruled all objections to the petition and found that Freeman was a surviving spouse within the meaning of section 78, subdivision (b).

The court denied Brendon's Probate Petition, filed on November 8, 2018, and sustained the objections filed by Freeman on April 17, 2019.

The court denied Brendon's Section 850 Petition for Recovery of Property filed April 2, 2019, and it sustained the objections filed by Freeman on June 17, 2019. The court found that Freeman was a surviving spouse within the meaning of section 78, subdivision (b), and did not waive his right to inherit under sections 141 and 145. The court also found that "'this Petition seeks to accomplish in the probate court that which could not be accomplished in the Family Law court.'" At the hearing, the court found that the MSA was not a complete property settlement within the meaning of section 145. This is reflected in the minute order, but not the Notice of Entry of Judgment.

## DISCUSSION

The parties do not contest that Freeman is a surviving spouse under section 78, subdivision (b). The issue before us is whether, by entering the MSA, Freeman waived the rights of a surviving spouse enumerated in section 141, subdivision (a). We hold that the MSA did effect a waiver of those rights. As explained below, based on our independent review of the MSA and the undisputed record evidence, the written MSA signed by Freeman and Patricia, each with the advice of counsel, constituted a "complete property settlement" within the meaning of section 145. Further, the MSA is an enforceable waiver of his rights as a surviving spouse, as Freeman fails to point to any evidence he was not provided with "[a] fair and reasonable disclosure of the property or financial obligations" of Patricia, prior to signing the MSA, as required by section 143, subdivision (a).

### *Standard of Review*

We resolve matters of statutory interpretation de novo. (*People v. United States Fire Ins. Co.* (2012) 210 Cal.App.4th 1423, 1426.) "'The general principles that guide interpretation of a statutory scheme are well[ ]settled. [Citation.] "Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] To ascertain such intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning. [Citation.] When interpreting statutory language, we may neither insert language which has been

11

omitted nor ignore language which has been inserted.  [Citation.]
The language must be construed in the context of the statutory
framework as a whole, keeping in mind the policies and purposes
of the statute [citation], and where possible the language should
be read so as to conform to the spirit of the enactment.
[Citation.]'" [Citation.]"  (*Jaime Zepeda Labor Contracting, Inc.
v. Department of Industrial Relations* (2021) 67 Cal.App.5th 891,
905.)

"Marital property settlement agreements are favored under
California law [citation], and governed by general contract
principles [citation]."  (*Safarian v. Govgassian* (2020) 47
Cal.App.5th 1053, 1063, fn. omitted.)  A settlement "'"must be so
interpreted as to give effect to the mutual intention of the parties
as it existed at the time of contracting, so far as the same is
ascertainable and lawful." (Civ. Code, § 1636; [citation].)  The
intention of the parties must be first determined from the
language of the contract itself.  (Civ. Code, § 1638; [citation].)
However, where the language of the contract is ambiguous, it is
the duty of the court to resolve the ambiguity by taking into
account all the facts, circumstances and conditions surrounding
the execution of the contract.  (Civ. Code, § 1647; [citation].)'"
(*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1252 (*Chacon*).)

The standard of review when construing a contract is de
novo, "including where conflicting inferences may be drawn from
undisputed extrinsic evidence, 'unless the interpretation turns
upon the credibility of extrinsic evidence.' [Citations.]  Put
simply, "'when the competent extrinsic evidence is not in conflict,
the appellate court independently construes the contract.'
[Citation.]"  (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65
Cal.App.5th 506, 531.)

*Surviving Spouse's Waiver of Rights Under the Probate Code*

Sections 140 through 147 comprise the Surviving Spouse's Waiver of Rights, and are codified as Chapter 1 of Division 2, Part 3 of the Probate Code. Section 145, entitled "Waiver of 'all rights,'" is "directed at two types of situations: (1) where the parties do not intend an agreement to be merged into a dissolution judgment; and (2) where one party dies after both have executed a marital settlement agreement but before the court has heard the matter for the purpose of rendering a judgment incorporating the agreement." (*Estate of Gibson* (1990) 219 Cal.App.3d 1486, 1492 (*Estate of Gibson*).)

Section 145 provides that "a complete property settlement entered into after or in anticipation of separation or dissolution or annulment of marriage, is a waiver by the spouse of the rights described in subdivision (a) of Section 141", unless the property settlement provides to the contrary. The surviving spouse's right to inherit and right to be appointed as the personal representative of the deceased spouse's estate that are at issue in this case are among the enumerated rights waived under section 141.[6] (§ 141, subd. (a).)

---

[6] Section 141, subdivision (a) states:

"The right of a surviving spouse to any of the following may be waived in whole or in part by a waiver under this chapter:

"(1) Property that would pass from the decedent by intestate succession.

"(2) Property that would pass from the decedent by testamentary disposition in a will executed before the waiver.

"(3) A probate homestead.

13

Under section 142, a waiver of a surviving spouse's rights under the Probate Code must be (1) in writing, (2) signed by the surviving spouse, and (3) enforceable under either section 143 or 144. (§ 142, subds. (a) & (b).)

Pursuant to section 143, subdivision (a), a waiver is enforceable unless the surviving spouse can demonstrate "(1) A fair and reasonable disclosure of the property or financial obligations of the decedent was not provided to the surviving spouse prior to the signing of the waiver unless the surviving spouse waived such a fair and reasonable disclosure after advice by independent legal counsel" or "(2) The surviving spouse was not represented by independent legal counsel at the time of signing of the waiver." As relevant here, section 142 provides, "[e]nforcement of the waiver against the surviving spouse is subject to the same defenses as enforcement of a contract, except that. . . [] [l]ack of consideration is not a defense to enforcement of the waiver." (§ 142, subd. (c).)

---

"(4) The right to have exempt property set aside.

"(5) Family allowance.

"(6) The right to have an estate set aside under Chapter 6 (commencing with Section 6600) of Part 3 of Division 6.

"(7) The right to elect to take community or quasi-community property against the decedent's will.

"(8) The right to take the statutory share of an omitted spouse.

"(9) The right to be appointed as the personal representative of the decedent's estate.

"(10) An interest in property that is the subject of a nonprobate transfer on death under Part 1 (commencing with Section 5000) of Division 5."

Alternatively, a waiver is enforceable pursuant to section 144, subdivision (a), if a court determines either: "(1) The waiver at the time of signing made a fair and reasonable disposition of the rights of the surviving spouse"; or "(2) The surviving spouse had, or reasonably should have had, an adequate knowledge of the property and financial obligations of the decedent[.]"[7]

### *The MSA Is a Complete Property Settlement Within the Meaning of Probate Code Section 145*

Freeman contends that the MSA is not a "complete" property settlement because "[a] complete property agreement must identify itself as such," and the MSA does not expressly state that it is a complete property settlement. Freeman's construction of section 145 is contrary to the statutory language. Section 145 sets forth two distinct mechanisms for a spouse to waive the rights of a surviving spouse: (1) by making an express statement waiving "'all rights' (or equivalent language) in the property or estate of [the other spouse]"; or (2) by "a complete property settlement entered into after or in anticipation of separation or dissolution or annulment of marriage." It is significant that the first mechanism—what we refer to as an express waiver—requires specific language; however, the second mechanism—what we refer to as a statutory waiver—is effected

---

[7] Section 144 includes an exception to enforceability of a waiver if the decedent spouse violated his or her fiduciary duties as specified in Family Code section 721, subdivision (b), or if a probate court finds enforcement of the waiver would be unconscionable. These exceptions are not argued or presented here, and we omit further discussion of them.

by entry into a property settlement, with no direction in section 145 that any express language must be used by the parties. Here, we are presented only with this second mechanism, and we decline to read into the statute a requirement for parties to use any specific language when making a complete property settlement.

In the absence of support in the language of section 145, Freeman cites to *Miller v. Miller* (1949) 94 Cal.App.2d 785 (*Miller*), in which the Court of Appeal held that the decedent's former wife did not waive her interest as a beneficiary under the decedent's life insurance policies pursuant to a property settlement agreement that the couple entered into prior to divorce. Freeman represents that *Miller* held the property settlement was incomplete because the property settlement did not state that all of the couple's property had been included in the agreement. (*Id*. at 790.)

We note that *Miller*, a case decided over seventy years ago, did not involve interpreting the language of the Probate Code provision at issue here, which was added to the code in the early 1980's. (*Estate of Gibson*, *supra*, 219 Cal.App.3d at p. 1491.) Even looking to *Miller* for guidance, however, it is clear that the determination of whether an agreement is a complete resolution of property issues between spouses who are separating requires consideration of the totality of the circumstances; the determination does not turn solely on whether the parties' agreement includes an express statement that it is "complete."

In *Miller*, a husband and wife entered a written agreement dividing specified property between them. The agreement included a provision stating that each spouse waived certain rights against the other arising from the marriage, including any

16

right to inherit from, or administer the estate of the other. (*Miller*, *supra*, 94 Cal.App.2d at pp. 786–787.) After the filing of a divorce action and issuance of an interlocutory decree, the husband died. The wife then sought to collect on four insurance policies, two that named her as the designated beneficiary and two that provided for inheritance by a widow; the husband's siblings contested the wife's status as a beneficiary, contending the property agreement the wife and husband had entered constituted a waiver of the wife's rights to inherit under the insurance policies.[8] The *Miller* court concluded that the wife was entitled to collect on the insurance policies. In reaching its decision, the court noted that the agreement made no mention of the insurance policies, and no waiver of any interest in any property not mentioned. But the absence of language covering all potential property was not alone conclusive. The court also

---

[8] At the time of *Miller*, divorce proceedings in California involved first issuing an interlocutory judgment declaring that an innocent spouse was entitled to dissolution, but the marriage was not dissolved until entry of a final judgment. (See *In re Marriage of Goldberg* (1994) 22 Cal.App.4th 265, 273.) The death of a party spouse after interlocutory judgment but before final judgment abated a divorce action as to the status of the parties, but did not as to any division of property in the interlocutory degree. (*Id*. at p. 274; *McClenny v. Superior Court* (1964) 62 Cal.2d 140, 144 ["The death destroys the cause of action for the dissolution of the marriage; it does not liquidate the property rights which crystallized in the interlocutory decree"]; *Klebora v. Klebora* (1931) 118 Cal.App. 613, 618.) As a result, in *Miller*, the property agreement entered into between the spouses survived the husband's death, but the wife nevertheless qualified as a widow, because the husband's death, and not the interlocutory decree of divorce, terminated their marriage.

17

looked at the nature of the omitted property and the husband's conduct: insurance policies create only an expectancy interest for the beneficiary, which can be changed. The court found that "the failure of the husband to exercise his power to change the beneficiary ordinarily indicates that he did not wish to effect such a change." (*Id*. at p. 790.) In addition, the court looked at other extrinsic evidence of the parties' intent: shortly prior to his death, "the husband handed the policies to the [wife] saying, 'Here is some papers that belong to you.' Two days later, in the presence to two other witnesses, she offered to return the policies to him and he refused to take them, saying that they belonged to her." (*Id*. at p. 791.)

In sum, *Miller* does not stand for the proposition that a property settlement must state on its face that it is intended to be a complete property settlement if it is to be treated as such. To the contrary, *Miller* teaches that where such a clear expression of intent is not contained in the language of the agreement, the court looks to other evidence, including other language in the agreement, the nature of the property at issue, and the actions of the parties, to determine whether the settlement was intended to be complete.

Here, the fact that the property settlement does not expressly identify itself as either "partial" or "complete" does not compel the conclusion that the settlement was intended to be only partial. (See *Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164; see also *Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486 ["The court . . . cannot insert in the contract language which one of the parties now wishes were there"].)

Absent a clear expression of intent in the language of the agreement, we look to other evidence to discern the parties' intent.  (*Chacon, supra*, 181 Cal.App.4th at p. 1252.)  The parties' actions and surrounding circumstances demonstrate that Patricia and Freeman considered the MSA to be a complete property settlement.  Freeman's Petition for Dissolution and Patricia's response thereto both requested that the family court divide their community and quasi-community property.  Freeman listed this property in an attachment to the petition.  The same list is set forth in more detail in the MSA, and, as Brendon points out, allocates very specific items of personal property, including the contents of the couple's garage.  The MSA additionally contains a "catch-all" provision for items of personal property that are not specifically identified—all items of personal property that were in Patricia's possession (Patricia lived in the marital home) were awarded to her.  The MSA states that all other credits and reimbursements are waived.  Finally, the MSA contains a provision requesting that the family court make the MSA its order, which is consistent with the couple's requests in the dissolution petition and response that the court divide their community and quasi-community property.  In short, nothing in the parties' actions or the language of the MSA indicates that it was intended to be a partial settlement; the evidence fully supports that the MSA was intended to be a complete property settlement.

Nothing that occurred after the MSA was executed suggests the parties did not have a meeting of the minds regarding whether the property settlement was complete.  Although Freeman now makes much of Patricia's objections to his proposed judgment during the family court proceedings,

19

Patricia's objections were to a draft judgment, not the division of property set forth in the MSA.[9] Patricia did not view the proposed judgment as faithful to the parties' agreement, and to the extent that disputes over the terms of the judgment could be seen as implicating the terms of the MSA, she requested that the mediator resolve those issues—as the MSA provided—prior to judgment. She did not argue that the MSA's division of property was incomplete or void—she argued that the version of the judgment drafted by Freeman's counsel should not be enforced because there were disputes regarding judgment provisions and the meaning of the MSA's terms that the mediator had to first resolve before the court could enter a judgment of dissolution.

For his part, Freeman expressed no concerns regarding the completeness of the MSA. Rather, he submitted a second proposed judgment, which he said was "'the mirror-image of the parties' agreement . . . .'" (*Welch v. Welch* (June 3, 2020, B295880) [nonpub. opn.].) He then sought entry of the judgment

---

[9] We note that the probate court's "finding" that there was not a complete property settlement appears to have been based on a misunderstanding of our prior opinion: at the hearing, the court concluded that the various disputes of the parties over entry of judgment in the dissolution action, and highlighted in our prior opinion, meant there was no meeting of the minds when the parties entered the MSA. The probate court's analysis confuses the MSA with the draft judgment. Moreover, there is no substantial evidence in the record that would support a finding that the parties did not have a meeting of the minds when entering the MSA.

of dissolution pursuant to the terms of the MSA under Code of Civil Procedure 664.6.[10]

Freeman next argues that the MSA was not a complete property settlement because it left certain terms to be determined in the future and omitted some property from allocation. With respect to his argument that some terms were left undetermined, Freeman asserts that the balances of financial accounts that were identified in the MSA for division were subject to confirmation; Patricia reserved the right to review and verify the documents and amounts of all accounts; the exact amounts of an equalization payment had not been calculated; a Propertizer had not been prepared; and the tax impact division of retirement benefits under the QDRO had not yet been calculated by attorney Nancy Bunn, as the MSA provided.

The MSA's terms were not uncertain simply because verifications and calculations had yet to be performed. The MSA set forth the percentages that each of the parties would receive from each of the accounts and/or items of property identified. Those percentages were fixed regardless of the valuation ultimately placed on the property. The methods of valuation are also sufficiently set forth to permit future performance (i.e., Propertizer, fair market value, calculations by a specific attorney, etc.).

When asked to identify specific property that was omitted from the settlement agreement, Freeman is unable to do so. Conceding that there is no evidence establishing the existence of

---

[10] We note that although the respondent's brief argues that the MSA is not a complete property settlement, it does not contend that Freeman did not intend the MSA to be a complete property settlement when he entered into it.

an omitted asset, Freeman contends that we can infer the property settlement was not complete because Patricia lodged objections to his motion to enforce the family law judgment. Pressed further on which of Patricia's objections comprise sufficient evidence to support a finding that a specific, material asset was omitted, Freeman highlights that Patricia sought to include in the draft family court judgment boilerplate provisions addressing choses in action, encumbrances and liens, insurance policies, and social security benefits. But none of Patricia's suggested provisions are more than generic: they certainly do not offer any basis to conclude the parties failed to account for an actual, known asset or liability, or a chose in action or encumbrance that needed to be dealt with separately from an asset that one of them was to take through the settlement agreement. While the existence of social security benefits might be assumed, it is of no moment as federal law "bars Social Security benefits from being characterized as community property and divided in a dissolution proceeding." (*In re Marriage of Peterson* (2016) 243 Cal.App.4th 923, 931; *In re Marriage of Cohen* (1980) 105 Cal.App.3d 836, 843 [social security benefits are "not an asset of the community" and "not subject to division"].)

Our Supreme Court has emphasized that, "few contracts would be enforceable if the existence of subsequent disputes were taken as evidence that an agreement was never reached." (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 351–352.) As a practical matter, many property settlements that parties intend to be complete overlook or disregard some items of property. If we were to judge the "completeness" of a property settlement based solely on whether it provided for the precise allocation of every

22

item of community or quasi-community property, no matter how immaterial, it would be a rare property settlement that could be deemed complete, despite the parties' intentions that the settlement be treated as such. It is clear from Freeman's actions that any objections Patricia may later have had were not material to him when the couple entered into the settlement agreement, or, indeed, at any time prior to the erroneous entry of judgment. It is also clear that Patricia believed that the allocation of these items would in fact be decided per the terms of the MSA—i.e. that any ambiguity in the agreed-upon allocation could be clarified with a ruling from the mediator. The contents of the MSA with respect to the division of property, actions of the parties, and the surrounding circumstances all indicate that the parties intended for the property settlement to be complete. Moreover, the record supports that Freeman and Patricia succeeded: the agreement itself does not suffer from material omissions that would undermine that intent. We therefore conclude that the property settlement is a "complete property settlement" within the meaning of section 145.

### *The MSA Operates as an Enforceable Waiver*

Having concluded that Freeman and Patricia effected a statutory waiver by entering into the MSA, we now turn to whether that waiver is enforceable in this probate proceeding, as required by section 142. First, the MSA is a written agreement, which Freeman signed; this is all that is required by section 142, subdivision (a).

Section 142, subdivision (b), additionally provides that a waiver is only enforceable if it satisfies either section 143 or

23

section 144. Under section 143, subdivision (a), a waiver of the rights enumerated in section 141 is enforceable, "unless the surviving spouse proves either [that] (1) A fair and reasonable disclosure of the property or financial obligations of the decedent was not provided to the surviving spouse prior to the signing of the waiver unless the surviving spouse waived such a fair and reasonable disclosure after advice by independent legal counsel" or that "(2) The surviving spouse was not represented by independent legal counsel at the time of signing of the waiver." Freeman has not met his burden under either subdivision (a)(1) or (a)(2) of section 143.

Freeman does not point to evidence in the record identifying any particular property or financial obligation that Patricia failed to disclose to him prior to entering the MSA. The only reasonable inference from the record is that Patricia made a fair and reasonable disclosure; specifically, it is undisputed that Patricia and Freeman each filed and served the information required by Family Code section 2104, also known as a preliminary declaration of disclosure, prior to holding their mediation and signing the MSA. By statute, "[a] preliminary declaration of disclosure shall set forth with sufficient particularity, that a person of reasonable and ordinary intelligence can ascertain, . . . the identity of all assets in which the declarant has or may have an interest and all liabilities for which the declarant is or may be liable, regardless of the characterization of the asset or liability as community, quasi-community, or separate." (Family Code, § 2104, subd. (c)(1).) Freeman not only concedes he had Patricia's preliminary disclosure prior to entering the MSA, he repeatedly argued to the family court that the exchange of that information was sufficient

24

for obtaining a dissolution judgment.  Indeed, Freeman was sufficiently satisfied with Patricia's preliminary declaration of disclosure, that he subsequently waived receipt of her final declaration of disclosure.  Moreover, he has not made any argument or offered any evidence since Patricia's death suggesting any deficiencies in the disclosures she made prior to signing the MSA.  We find this uncontroverted evidence sufficient to defeat any contention that Patricia did not make a fair and reasonable disclosure of the information required to make a waiver enforceable under section 143.[11]

### *Defenses to Enforcement of the Waiver*

Freeman additionally contends that because certain issues were never resolved or completed in the dissolution action in family court, the MSA cannot be enforced in this probate action. We reject these contentions.

---

[11] In light of our conclusion that the statutory waiver is enforceable pursuant to section 143, we need not address whether the waiver would alternatively be enforceable pursuant to section 144.  We note that, unlike section 143, which places the burden on the surviving spouse to prove a lack of disclosure, section 144 makes a waiver enforceable where a court determines either that: (1) the MSA when signed made "a fair and reasonable disposition of the rights of the surviving spouse"; or (2) "the surviving spouse had, or reasonably should have had, an adequate knowledge of the property and financial obligations of the decedent[.]"  There is no indication in this record that Freeman has ever contended that the MSA did not, when made, make a fair and reasonable disposition of his rights; nor has he ever contended that he lacked knowledge of Patricia's property and financial obligations.

25

## The Property Settlement Provisions of the MSA Are Not Dependent Upon Entry of a Judgment of Dissolution

Freeman first contends that the MSA never became effective because the family court did not enter a judgment of dissolution, and could not have entered a judgment because it lost jurisdiction upon Patricia's death. He argues that the MSA was void under Civil Code 1598 because it had a single purpose—entry of the judgment—which was wholly impossible of performance. This contention lacks merit.

Civil Code section 1598 provides: "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." In this case, the MSA included several distinct objectives, however—including setting spousal support, dividing the couple's property, facilitating the entry of a judgment dissolving the marriage, and providing procedures to resolve any subsequent disputes. Civil Code section 1598 is therefore inapplicable.

Freeman points to no provision in the MSA that states that the entry of judgment is a condition of formation of the MSA. Although the parties agreed to prepare a formal judgment to submit to the mediator and agreed that the mediator would serve as the judicial officer with respect to all issues that arose from the settlement, entry of the judgment, and postjudgment matters, the plain language of the MSA does not condition the division of the couple's property on either the preparation or the entry of a judgment. The property settlement is not altered simply because

26

a judgment of dissolution was not entered and is now impossible to enter as a result of Patricia's death.[12]

Moreover, contrary to Freeman's assertions, we did not hold that the "*object of the [MSA]*" was impossible of performance or void in our prior opinion in the family court action. We held that *the judgment could not be entered* because the family court had lost jurisdiction, which is an entirely separate issue. Our prior opinion does not foreclose the possibility that the MSA operates as a waiver of Freeman's rights as a surviving spouse under the Probate Code.

## **Lack of Decedent's Final Declaration of Disclosure**

Freeman also argues that the MSA is unenforceable because Patricia did not make and serve her final declaration of disclosure in the dissolution action and never entered into a mutual waiver of disclosures with him pursuant to Family Code section 2105, subdivision (a). Family Code section 2105, subdivision (a) states: "Except by court order for good cause, before or at the time the parties enter into an agreement for the

---

[12] Freeman also appears to argue in a conclusory manner, and without development, that because the MSA addressed spousal support in addition to the division of property, the fact that no judgment was entered ordering spousal support somehow undermines the validity of the property settlement. We disagree. The spousal support provision included in the MSA, consistent with spousal support generally, included a provision never disputed by the parties that spousal support would terminate upon the death of either party. This provision underscores that the property division settlement was intended to, and did, operate independently of any payment of support.

resolution of property or support issues other than pendente lite support . . . each party, or the attorney for the party in this matter, shall serve on the other party a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury on a form prescribed by the Judicial Council, unless the parties mutually waive the final declaration of disclosure. . . ." Section 2105 permits a family court to set aside the judgment if the parties fail to comply with its terms or with the requirements of Family Code sections 2102 and 2104. (Fam. Code, § 2105, subd. (d).)

Freeman cites to section 142, subdivision (c), in support of this argument, presumably likening the requirement for an exchange of final declarations of disclosure in a dissolution action to a defense against enforcement of a contract. His argument is belied by the statutory scheme of Chapter 1. Nothing in sections 140 through 147 suggests that waivers under the chapter are subject to the requirements set forth in the Family Code, or states that a waiver is subject to enforceability requirements additional to those listed. Indeed, attempting to import a requirement of strict compliance with the Family Code's prerequisites to a completed dissolution judgment into Chapter 1 would undermine both the purpose and language of the Probate Code's statutory scheme. Significantly, section 145's waiver provision applies to agreements between spouses not only in anticipation of dissolution of a marriage, but also "after . . . *separation*." (§ 145 (emphasis added).) There is no dispute that happened here: Freeman and Patricia separated in September 2015 and signed their property agreement in October 2017.[13]

---

[13] Waivers under Chapter 1 even apply to pre-marital agreements, which are made without the service of declarations

28

Given that Chapter 1 applies even when the parties separate without initiating a case in family court, it would make no sense to interpret the Probate Code to require compliance with Family Code provisions that only become operative upon the filing of a petition for dissolution or legal separation. (See Fam. Code, § 2103 [requiring declarations of disclosure only in proceedings for dissolution or legal separation].)

Moreover, attempting to import into the Probate Code the Family Code's specific requirements of the final declaration of disclosure would be at odds with Chapter 1's provision that there can be a valid waiver of rights of survivorship even absent any disclosure about property by the decedent. (See § 144, subd. (a)(2) [providing for a valid waiver where "the surviving spouse had, or reasonably should have had, an adequate knowledge of the property and financial obligations of the decedent," or where the waiver included a reasonable disposition of the surviving spouse's rights.) These provisions would be rendered meaningless if we were to adopt Freeman's position that strict compliance with the disclosure obligations set forth in the Family Code are prerequisites to a valid waiver of rights under the Probate Code.

Section 145's disclosure requirements are less stringent than the disclosure requirements of Family Code section 2105, and would be subsumed within its requirements if both statutes applied. Had the Legislature intended for Family Code section 2105's disclosure requirements to apply, section 145's treatment of statutory waivers would be redundant and unnecessary—a

_____

of disclosure. (§ 140 [making waivers of the rights of a surviving spouse applicable to pre-marital agreements]; see *Estate of Gibson, supra,* 219 Cal.App.3d at p. 1492.)

construction that we avoid when interpreting statutes. (*State ex rel. Bartlett v. Miller* (2016) 243 Cal.App.4th 1398, 1410.) We therefore hold that compliance with Family Code section 2105 is unnecessary to effectuate a waiver pursuant to section 145; disclosure requirements for statutory waiver under section 145 are governed by the provisions of the Surviving Spouse's Waiver of Rights chapter of the Probate Code.[14]

---

[14] We also reject Freeman's assertion that, to the extent that the MSA operates to revoke the nonprobate transfer contemplated in the couple's revocable trust and eliminates his right of survivorship, it violates the notice requirements of Family Code 2040—another Family Code section that is not referenced in the Surviving Spouse's Waiver of Rights chapter of the Probate Code. The restraining orders put in place by Family Code 2040 prohibit unilateral actions of the parties that would have these effects "without the written consent of the other party or an order of the court." (Fam. Code, § 2040, subd. (a)(1).) Under section 142, subdivision (a), a complete property settlement *cannot* operate as a waiver without the written consent of the other spouse by definition—a complete property settlement must be written and signed by both parties to operate as a waiver of the surviving spouse's rights.

## DISPOSITION

We reverse the probate court's January 14, 2021 orders: (1) denying Brendon's Petition for Recovery of Property and sustaining Freeman's objections thereto, and (2) denying Brendon's Petition for Letters of Administration and granting Freeman's Petition for Probate of Will.  We remand to the probate court for further proceedings consistent with this opinion. Appellants Brendon Welch and Jeanne Donohoe are awarded their costs on appeal.


MOOR, J.


We concur:



RUBIN, P. J.



KIM, J.

31